301 Ga. 505
FINAL COPY

S17A0542.  MENEFEE v. THE STATE.
S17A0543. WILLIAMS v. THE STATE.


BENHAM, Justice.

Appellants Travon Menefee and Christian Williams appeal their convictions for malice murder and related crimes stemming from a "drug deal gone bad" which resulted in the death of Antonias Williams (no relation to Christian).[1]  For reasons set forth below, we affirm in part, vacate in part and remand the cases to the trial court to address errors in sentencing.

---

[1] The crimes occurred on May 5, 2012.  On November 8, 2013, a Fulton County grand jury indicted Menefee, Christian and co-defendant Harold Clements on charges of malice murder (Antonias Williams), two counts of felony murder (Antonias Williams), attempted armed robbery (Daniel Alexander), aggravated assault with a deadly weapon (Antonias Williams), aggravated assault with a deadly weapon (Jamol Alexander), and possession of a firearm during the commission of a felony.  In addition, Menefee was charged with felony murder predicated on possession of a firearm by a first offender probationer and possession of a firearm by a first offender probationer.  Menefee, Christian and Clements were tried jointly from December 8 to December 12, 2014, and the jury found Menefee and Christian guilty on all charges for which they were indicted.  On February 3, 2015, the trial court sentenced Menefee and Christian to life in prison for malice murder, 20 years to serve concurrently for aggravated assault (Jamol Alexander), and a five-year suspended sentence for possession of a firearm during the commission of a felony.  In addition, Menfee was sentenced to five years for possession of a firearm by a first offender probationer to be served concurrently to malice murder.  The trial court erroneously sentenced Menefee and Christian to serve 20 years concurrently for the aggravated assault of Antonias Williams.  The trial court erroneously merged the count of attempted armed robbery (Daniel Alexander) into the malice murder count.  The remaining felony murder counts were vacated as a matter of law.  Menefee moved for a new trial on February 26, 2015 and amended the motion on January 14, 2016.

In a light most favorable to upholding the verdicts, the evidence shows that on the early afternoon in question, Daniel Alexander, his brother Jamol Alexander and three of their friends — Cimieon Riley, Andre Morris and Antonias Williams — drove together to the Hickory Park Apartments in order to purchase marijuana from Christian. Daniel had previously purchased drugs from Christian without incident. Inside the vehicle, Jamol had an AK-47 rifle[2] perched against the front seat, and there was also a 9mm Ruger[3] that was eventually recovered by police from inside Antonias's pants. The group of men brought the guns because Hickory Park had a reputation for being unsafe. A police officer familiar with the area testified that Hickory Park was a known place for drug transactions and gun violence. When the group arrived, Daniel exited the car to speak with Christian, and Riley exited the car to speak with Menefee, whom Riley knew personally.

---

Christian moved for a new trial on February 12, 2015 and amended his motion on January 1, 2016, and on February 10, 2016. The trial court conducted a joint hearing on the motions as amended on January 20, 2016, and denied the motions in a joint order issued on March 23, 2016. Menefee filed a notice of appeal on March 29, 2016, and his case was docketed in this Court for the term beginning in December 2016, and submitted for a decision to be made on the briefs. Christian filed a notice of appeal on April 4, 2016, and his case was docketed in this Court for the term beginning in December 2016 and was orally argued on March 6, 2017.

[2] Jamol lawfully purchased the AK-47.

[3] The 9mm Ruger belonged to the Alexander brothers' father. Daniel testified that he had left the gun under one of the seats in the car the night prior to the incident. The evidence at trial was unclear how or when the gun came to be in Antonias's pants.

Christian told Daniel he did not have the drugs with him and instructed the group to drive to the back of the complex. When the men arrived at the back of the complex, Riley, Morris and Daniel exited the vehicle, while Jamol and Antonias remained inside the vehicle with Antonias sitting behind Jamol. During Daniel's encounter with Christian, Christian walked away and came back several times, purporting to get the drugs. When Christian last approached the car on the passenger side, Daniel testified he was retrieving the cash for the drugs from the glove compartment. At that point, Christian pulled out a gun, held it to Daniel's head and told him to "give it up," meaning Christian wanted the money, and the two men then began "tussling" for the gun.[4] Daniel testified that Christian attempted to pull the trigger on the gun, but it jammed. Daniel said he started to reach for the AK-47 to ward off Christian and said that, upon Christian's seeing the rifle inside the vehicle, Christian yelled something to the effect of, "They have a gun, shoot, shoot, shoot!" At these words, Menefee and a man with dreadlocks,[5] who were both

---

[4] Daniel, Jamol and Riley all testified that Christian pulled a gun on Daniel and that there was a struggle over the gun.

[5] Harold Clements, who was a friend of Christian and Menefee and who had dreadlocks, was indicted, tried and convicted along with Menefee and Christian. The trial court, however, granted Clements a new trial in light of newly discovered evidence that the police were aware of another man with dreadlocks who purportedly was involved in the murder.

3

standing near the car by that time,[6] opened fire as Christian fled. Once the shooting stopped, Daniel managed to retrieve the rifle and load it, but he did not shoot because all three perpetrators had fled by that time.

In the melee, Jamol was shot in the arm and Antonias was fatally shot in the head. Jamol testified Menefee was standing on the side of the vehicle where Antonias was sitting with the window rolled down. Jamol said he saw Menefee shoot Antonias in the head. Jamol also said that it was the dreadlocked man who shot him.

At some point, Daniel reentered the car and Jamol began driving away. They picked up Morris on their way out of the apartment complex.[7] About four minutes later, Jamol pulled the car over onto the side of a highway because its tires had been deflated by bullets. Once pulled over, Daniel exited the car and flagged down a passing driver who called 911.

The State presented several witnesses to testify about the physical evidence. A ballistics expert testified that none of the shell casings and projectiles that were recovered from the scene of the shooting were fired by

---

[6] Daniel testified Menefee was standing toward the back of the car near Antonias's window and the dreadlocked man was standing near Jamol's driver-side window.

[7] Riley, who ran when he heard gunshots, did not return to the vehicle.

4

the weapons recovered from Jamol's car. In addition, the police did not recover any shell casings or projectiles from inside the vehicle. Antonias's hands were tested for gunshot residue, but the results were negative. A police investigator testified that the other occupants' hands were not tested for gunshot residue because their investigation led them to believe no gunshots had been fired from the car. The medical examiner testified Antonias died from a gunshot wound to the back of his head and that the bullet was still lodged there at the time of the autopsy. He also said he found gunpowder in the wound, explaining this meant the muzzle of the gun was within a few feet of Antonias at the time of the shooting.

*Case No. S17A0542*

1. Menefee contends the evidence was insufficient to convict him of the crimes of the attempted armed robbery of Daniel Alexander and the aggravated assault of Jamol Alexander because there is no evidence he committed any crime against either of the brothers. We disagree. Pursuant to OCGA § 16-2-20 (a), "[e]very person concerned in the commission of a crime is a party thereto and may be . . . convicted of commission of the crime." This includes aiding and abetting another. See OCGA § 16-2-20 (b) (3). This Court has explained:

5

> Evidence of a defendant's conduct prior to, during, and after the commission of a criminal act will authorize the defendant's conviction for commission of the criminal act if a jury could infer from the conduct that the defendant intentionally encouraged the commission of the criminal act.

Jordan v. State, 272 Ga. 395, 396 (1) (530 SE2d 192) (2000). Here, Christian lured the men to a more isolated part of the complex and leveled a gun to Daniel's head in an effort to rob him of the money he had brought to purchase drugs. As Christian was attempting to rob Daniel, Menefee and the dreadlocked man armed themselves and surrounded the vehicle. When Christian directed them to shoot their weapons, Menefee and his compatriot opened fire, injuring Jamol and fatally injuring Antonias. Although the evidence showed Menefee was the person who shot and killed Antonias, a jury could reasonably infer Menefee was part of the overall scheme, led by Christian, to rob Daniel of the money he brought to buy drugs. The evidence was sufficient to authorize a rational trier of fact to find Menefee guilty of being a party to the crime of the attempted armed robbery of Daniel Alexander and the aggravated assault of Jamol Alexander, as well as the other crimes for which the jury returned verdicts of guilty. See Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); Sims v. State, 281 Ga. 541 (1) (640 SE2d 260) (2007).

6

2. (a) Menefee contends the trial court erred when it did not give charges on mutual combat and voluntary manslaughter. The record shows Menefee asked for these two jury charges, but then affirmatively withdrew his request for charges on lesser included offenses and then affirmatively waived his objections to the trial court's declining to charge on mutual combat or voluntary manslaughter. Because the record shows Menefee invited the error of which he now complains, the matter is not subject to direct appellate review or review for plain error. See Woodard v. State, 296 Ga. 803 (3) (a) (771 SE2d 362) (2015).

(b) To the extent Menefee claims his trial counsel was ineffective for his actions in withdrawing and waiving his objections concerning the charges on mutual combat and voluntary manslaughter, such claim must also fail. "To prevail on a claim of ineffective assistance of counsel, an appellant must prove both deficient performance of counsel and prejudice from the deficient performance." (Citation and punctuation omitted.) Gill v. State, 295 Ga. 705, 708 (2) (763 SE2d 719) (2014). Menefee cannot meet this burden of proof.

This Court has held that "[m]utual combat requires that both parties are at fault and are willing to fight because of a sudden quarrel." Jenkins v. State, 270 Ga. 607, 609 (2) (f) (512 SE2d 269) (1999). Here, there was no such

7

evidence. Daniel and his friends came to Hickory Park to purchase drugs from Christian. While Daniel and his friends had two weapons at their disposal, there was no evidence anyone in the group fired the guns at defendants or threatened to use the guns against the defendants. Rather, the evidence shows Christian began the deadly sequence of events by pulling a gun on Daniel and then escalated the encounter when he told his compatriots to shoot. Given the one-sided nature of the encounter, a charge on mutual combat was not warranted.

Likewise, there was no evidence of a sudden provocation warranting a charge on voluntary manslaughter. This Court has explained:

> To support a charge of voluntary manslaughter, there must be evidence that the accused acted solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person. Whether such evidence exists is a question of law, but even slight evidence showing that the victim seriously provoked the defendant requires the trial court to give a requested charge on voluntary manslaughter. This Court has held, however, that neither fear that someone is going to pull a gun nor fighting are the types of provocation which demand a voluntary manslaughter charge.

(Citations and punctuation omitted.) Smith v. State, 296 Ga. 731, 737 (3) (770 SE2d 610) (2015). Here, the evidence showed Antonias was sitting in the car when Menefee shot him in the back of the head. There was no evidence

8

Menefee and Antonias knew each other or had even exchanged words that day. There was some evidence presented at trial that Antonias may have had the 9mm Ruger in his hand at some point, but there was no evidence that he threatened anyone with the gun. The only "provocation" was Christian's directive to shoot. There was no evidence that Antonias did anything to Menefee to provoke an irresistible passion within Menefee inducing him to shoot. Menefee cannot prevail on an ineffective assistance claim based on trial counsel's decision to forgo pursuing jury charges that were unsupported by the evidence. See Ruffin v. State, 296 Ga. 262 (4) (a) (765 SE2d 913) (2014).

*Case No. S17A0543*

3. As to Christian, the evidence adduced at trial and summarized above was sufficient to authorize a rational trier of fact to find him guilty beyond a reasonable doubt of the crimes for which he was convicted. Jackson v. Virginia, supra, 443 U. S. at 319.

4. Having forfeited the right to ordinary appellate review of the prosecutor's opening and closing arguments by failing to make contemporaneous objections,[8] Christian now seeks to attack those arguments

---

[8] See Metts v. State, 270 Ga. 481, 484 (4) (511 SE2d 508) (1999) ("An objection to improper closing argument must be voiced when the alleged impropriety occurs at trial in order that the trial court may take remedial action, if necessary.").

9

by asserting an ineffective assistance of counsel claim. Christian contends trial counsel was constitutionally ineffective for failing to object to various statements the prosecutor made in his opening and closing arguments to the jury because he argues some of the statements constituted prosecutorial misconduct, violated the "golden rule," improperly vouched for the credibility of the victims, improperly inflamed the passions of the jury, and/or misrepresented the evidence. In order to prevail on a claim of ineffective assistance of counsel, Christian

> must show counsel's performance was deficient and that the deficient performance prejudiced him to the point that a reasonable probability exists that, but for counsel's errors, the outcome of the trial would have been different. A strong presumption exists that counsel's conduct falls within the broad range of professional conduct.

(Citation and punctuation omitted.) Pruitt v. State, 282 Ga. 30, 34 (4) (644 SE2d 837) (2007). For the reasons set forth below, we agree with the trial court that Christian did not meet the burden of proof necessary to show ineffective assistance.

(a) Attorneys are generally afforded wide latitude in making closing arguments. See Scott v. State, 290 Ga. 883 (725 SE2d 305) (2012). Indeed, we have held:

10

A closing argument is to be judged in the context in which it is made. [Cit.] What is more, a prosecutor is granted wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion; within the scope of such latitude is the prosecutor's ability to argue reasonable inferences from the evidence, including any that address the credibility of witnesses. [Cit.]

Id. at 885 (2). Similarly, when making opening statements, the prosecutor is allowed to state what the evidence is expected to show and the content of such statements is within the broad discretion of the trial court. See Massey v. State, 263 Ga. 379 (2) (434 SE2d 467) (1993). We have reviewed the record in its entirety, including the State's opening and closing arguments, and address each category of alleged improper statements in turn below.

(i) *Alleged Prosecutorial Misconduct*

At trial, the prosecutor asked Daniel Alexander what a "snitch" was and what negative repercussions a "snitch" might face among his peers. In closing argument, the prosecutor made an argument to the effect that the Alexander brothers and Cimieon Riley had risked their lives in coming forward to testify.[9]

---

[9] The prosecutor said the victims "took the stand and kind of braved coming [into] an open courtroom." He also stated during closing:

> You heard what Daniel said. What happens to snitches? I don't have to tell you all that. It's dangerous. Yeah, you could lose your life. Yeah, you could. They risked their lives getting up here. Risked their freedom telling the police what they were doing.

. . .

11

We cannot say this line of questioning and argument constituted prosecutorial misconduct. There was evidence that Riley knew co-defendant Menefee personally and that Daniel knew Christian from previous drug transactions. The record also showed Hickory Park had a reputation as a dangerous neighborhood where gun violence was not uncommon. That the victims may have faced some danger in coming forward was not a far-fetched argument for the prosecution to make to the jury based on the evidence. Since the argument was not improper, trial counsel was not deficient for failing to object. Cooper v. State, 296 Ga. 728 (3) (770 SE2d 597) (2015).

(ii) *Alleged Violations of the Golden Rule*

(A) The golden rule in Georgia jurisprudence is a rule that prohibits any argument asking jurors to place themselves in the position of the victims. See Martin v. State, 298 Ga. 259 (7) (c) (779 SE2d 342) (2015). According to Christian, the following closing statements violated the golden rule:

> Think about when y'all stood up during jury selection, because I watched all of you, and you were nervous a little bit. And that's okay. It's a room full of people you don't know. But all you had to do was say, like, well this is where I work, where I live, my family and stuff, you know. Right? And it wasn't a big deal.

That tells you Daniel Alexander sat up here, went through cross-examination, put his life in danger to testify in an open courtroom and told you the truth and was mocked for it.

Nobody was  — you know, you weren't in a room with somebody when you last saw them had guns in their hand. You weren't talking to a D.A., you know, when you know you were going to buy weed with guns. You've got to think about all of that when you consider their testimony.

. . .

You know, if I could — these defense [attorneys] throughout this trial hammered at those guys. Picked apart every — just think about it; two years ago, they gave some statements. If you gave a statement two years ago and then you're brought in front of 12 people you don't know, the people that shot you and killed your best friend, and then you are picked apart every two seconds and played little snippets of something you've said, could you do it? I mean, could you get it all perfect? Maybe. I don't know. I don't think so. That's not reasonable. That's lawyering, but that ain't reasonable and not the truth.

. . .

You heard Jamol. He didn't lie to his brother. He lied to the cops about telling his brother why they were going there. Why would he do that? Why would you want to tell the cops, look, man, my brother, he didn't know why — He didn't know why we were going there; he thought we were going to get a PlayStation. Why did he do that? To protect your brother. Right? Because you know it's your fault. You know you're the one that said, let's go get the weed, bring the AK, and bring the 9.  Because you're trying to get everybody else out of it because you know you feel guilty. That's common sense. That's what happened.

When one considers the entire trial record in this case, the above statements cannot be said to be clear violations of the golden rule.  At trial, the

13

Alexander brothers admitted they lied to police about the reasons they went to Hickory Park on the day in question. Initially, the brothers said they went there to purchase a gaming console. The authorities, however, did not believe this story and continued to interview the brothers who eventually told police they were there that day to purchase drugs. During the trial, the defense attorneys made a point to play the victims' recorded interviews with police and cross-examine them on any inconsistencies in their statements to police and their testimony during direct examination. In spite of the prosecutor's use of the pronoun "you," the above arguments can be more reasonably seen as the prosecutor's efforts to explain the reasons the brothers lied to police and to explain the inconsistencies in the brothers' statements as witnesses. "[W]e are reluctant to assume that the prosecutor intended [the arguments'] most damaging meaning." McClain v. State, 267 Ga. 378, 383 (3) (a) (477 SE2d 814) (1996). Even if the arguments could be construed as improper and counsel deficient for failing to object, as explained in Division 4 (b), infra, Christian has failed to establish the prejudice necessary to sustain an ineffective assistance claim.

(B) At trial, the evidence showed police found a bullet in Daniel's pocket when searching him alongside the highway on the day in question. Daniel

14

testified the bullet fell into his lap when Christian's gun jammed upon attempting to shoot, and Daniel said he placed the projectile in his pocket. In regard to this evidence, the prosecutor made the following statement during closing:

> If you reached up and grabbed — would it make sense to you; think about it — if you reached up and grabbed the gun — he tried to but it got jammed, so he tried to rack it and a bullet came out in your lap, and you got it in your pocket. Right?

This statement may have had the effect of asking the jurors to put themselves in Daniel's place at that moment of time during the encounter with Christian. However, how a bullet came to be in Daniel's pocket likely had no effect on how the jurors ultimately decided the case in light of the other evidence in the case. For example, Daniel, Jamol and Cimieon testified they saw Christian place a gun to Daniel's head. Daniel testified Christian told his compatriots to shoot and Riley testified Christian yelled something just prior to Menefee's and the dreadlocked man's opening fire. Any failure to object to this statement did not prejudice Christian.

(iii) *Alleged Vouching for the Victims' Credibility*

Christian contends the prosecutor personally vouched for the credibility of the victims by making the following statements:

15

That's somebody's kid, and [the defendants] killed him. And that's the truth.

. . .

Why do you think there are so many drug rips? . . . Nobody is going to tell on you because nobody is going to believe you. Not today. Not in this courtroom. Not in this case. Don't let that happen. Those witnesses were credible. Why would they lie?

. . .

And think about everything they went through to get up here. Because you heard those investigators. This is Atlanta. People don't come in and talk to the police. People don't just talk to the police, you know, and understandably. These guys didn't think the police were going to believe them.

. . .

Those witnesses were credible. They deserve your respect, not being mocked. Think about — think about what they went through when Daniel Alexander gets on the stand, and the defense lawyer says to him, what kind of normal human being does what you did? Basically, telling him, you are not a normal human being. What is that, what is he, an animal? What is that? Think about that. Why would anybody come forward in Atlanta? Why would anybody come forward, have to get on the stand, and be put through what they were put through by these lawyers. . . . Think about what they went through and still told the truth, same truth they told in 2012, and honor that.

. . .

What you had was scared, scared, scared young guys. And he's being bullied by the cops, and he lied. Is that so unbelievable they wouldn't want to say they [were] going to buy weed? That's the truth.

. . .

16

I'm asking you to believe the witnesses. To respect them. Treat them with the same respect you treat anybody. Because their –these lives, Daniel's life, Jamol's life, [Antonias Williams]'s life, they matter. They matter, okay.

. . .

[I]f you are tempted to be like, you know what, they all had guns, they are all — you know. If you start thinking that way, I want you to imagine the same facts, only instead of Yates Road, these guys are from up in Alpharetta, up in — no up in Suburban Cobb County. And they came down with Daddy's hunting rifle, and they went over to Hickory Park. Why should those folks get any more credence than Daniel Alexander and Jamol Alexander and Cimieon? Why should they get any more justice than [Antonias Williams]? Everyone has got [a] right to be believed until proven otherwise, and they were not proven otherwise in this courtroom.

When a prosecutor makes closing statements urging jurors to draw a conclusion from the trial evidence that a witness is credible, a defense counsel's failure to object does not constitute deficient performance because such statements are not improper. See Mason v. State, 274 Ga. 79 (2) (b) (548 SE2d 298) (2001). Here, the prosecutor was not giving his personal opinion about the veracity of the witnesses, but rather was permissibly arguing for the jurors to come to the conclusion that the witnesses were believable based on the evidence presented. Counsel was not deficient for failing to object. Id. at 80.

17

(iv) *Alleged Inflaming of the Passions of the Jury*

Christian also alleges the last argument quoted above was improper because it was racialized, thereby inflaming the passions of the jury. We disagree. Rather than inviting scrutiny through a racial lens, or some other bias, the prosecutor's statements entreated the jurors to consider the victims as they would any other victims regardless of their background. In this case, the fact that the victims were purchasing illegal drugs and were armed created credibility issues the State sought to overcome. The prosecutor, however, never mentioned the races of the victims or the defendants. There was no basis to sustain an ineffective assistance claim on this ground.

(v) *Alleged Misrepresentation of the Evidence*

During opening and closing arguments, the prosecutor made statements to the effect that the two guns the victims had with them in their vehicle were never fired. Christian contends this is a misrepresentation of the evidence because the ballistics expert did not testify the victims' two guns were never fired, but rather testified that the projectiles and shell casings collected from the shooting scene were not fired from those guns. Again, the prosecutor is allowed to argue inferences that may reasonably be made from the evidence

18

presented at trial. Allen v. State, 277 Ga. 502 (3) (b) (591 SE2d 784) (2004); Fugate v. State, 263 Ga. 260 (10) (431 SE2d 104) (1993). Here, in addition to the ballistics evidence, the Alexander brothers and Riley testified that no one inside the car fired the weapons. Also, the police tested and found no gun residue on Antonias's hands, although one of the weapons was found in his pants. Based on the evidence presented, it was not improper for the prosecutor to argue that the weapons in question had not been fired and any objection to such argument would have been without merit.

(b) Even if we were to assume counsel was deficient for failing to object to the prosecutor's opening and closing remarks identified by Christian, he still cannot prevail on his ineffective assistance of counsel claim because he cannot show prejudice. Here, the trial court admonished the jurors prior to the lawyers' opening arguments as follows:

> You are not bound by what any attorney says are the facts or the law during the trial. You take the facts from the witnesses and the other evidence presented in the case. You take the law from the court as given to you in the charge and as may be pronounced during the trial. By applying one to the other, make your judgment as a jury as to [the] truth of the case.

After closing arguments and prior to deliberations, the trial court charged the jury as follows:

19

> Your oath requires that you will decide this case based upon the evidence. Evidence is the means by which any fact that is put in issue is established or disproved. Evidence includes all the testimony of the witnesses and any exhibits admitted during the trial. Stipulations of the attorneys; that is, facts to which the attorneys have agreed with the approval of the court, [are] also considered evidence. *Evidence does not include* the indictment, the plea of not guilty, *opening or closing remarks of the attorneys, or questions asked by the attorneys*.

(Emphasis supplied.) It is presumed that the jury, which was under oath, followed the trial court's instructions unless there is clear evidence to the contrary. See <u>Allen v. State</u>, supra, 277 Ga. at 503. There is no evidence the jury considered anything but the witnesses' testimony and the trial exhibits presented in reaching its verdict. Trial counsel's making numerous objections during the State's opening and closing remarks, which do not constitute evidence, would not have affected the outcome of the trial.

5. Christian argues counsel was ineffective when he failed to impeach the lead investigator by challenging the veracity of the investigation with certain documents obtained from the Fulton County police department's investigative files, and when she failed to use certain arrest reports in support of a defense request to charge on leniency. However, Christian has not shown how he was prejudiced. While trial counsel did not use the documents as trial exhibits, counsel stated she used information contained therein to cross-

20

examine the law enforcement witnesses. As to the arrest reports, those documents only showed that Daniel Alexander and Andre Morris were charged with crimes the day after the shooting.[10] They did not show that the State had made any agreement with the victims for immunity or leniency in exchange for their trial testimony. Accordingly, the trial court was correct to conclude the evidence did not warrant a charge on leniency. The trial court did not err when it denied the ineffective assistance claims on this basis.

6. Christian contends the trial court erred when it did not give a charge on voluntary manslaughter. There was, however, no evidence of a sudden provocation warranting a charge on voluntary manslaughter. See Division 2 (b), supra. Here, the evidence showed Christian held a gun to Daniel's head in an effort to rob him of cash for a drug deal. Any alleged fear Christian had that the car's occupants would use their guns, which he presumably saw inside their vehicle as he was attempting to rob Daniel, is not the type of provocation which would require the trial court to charge the jury on voluntary manslaughter. Since there was no evidence of voluntary manslaughter, Christian also cannot prevail on an ineffective assistance claim based on trial

---

[10] The documents, which were exhibits to the motion for new trial hearing, show Daniel was charged with attempt and conspiracy to purchase marijuana and theft by taking (his father's handgun). Morris was only charged with attempt and conspiracy to purchase marijuana.

counsel's decision to forgo pursuing a jury charge that was unsupported by the evidence. See Ruffin v. State, supra, 296 Ga. at 266.

*Sentencing Errors Applicable to Both Appellants*

7. In reviewing the record, we have determined the trial court made sentencing errors which need to be corrected as to both appellants. See Hulett v. State, 296 Ga. 49 (2) (766 SE2d 1) (2014) (this Court may address sentencing errors not raised by the parties). First, the trial court erroneously merged the count for the attempted armed robbery of Daniel Alexander into the malice murder count concerning Antonias Williams. These two counts, which involve different victims and different elements of proof, do not merge for sentencing purposes. See id. at 55-56; Biddy v. State, 253 Ga. 289 (2) (319 SE2d 842) (1984). Therefore, appellants still need to be sentenced for attempted armed robbery. Second, the trial court erroneously sentenced appellants on the charge of aggravated assault of Antonias Williams. Since the aggravated assault immediately caused the fatal injury and there was no deliberate interval between the aggravated assault and the injury, that count should have merged as a matter of fact into the count for malice murder. See Hulett, supra, 296 Ga. at 55. Accordingly, appellants' sentences for the aggravated assault of Antonias Williams are vacated. See Slaughter v. State,

22

292 Ga. 573 (1) (740 SE2d 119) (2013). The cases are remanded for the trial court to sentence appellants for attempted armed robbery.

Judgments affirmed in part and vacated in part, and cases remanded with direction. All the Justices concur, except Nahmias and Grant, JJ., who concur in judgment only as to Division 4 (b).

Decided June 19, 2017.

Murder. Fulton Superior Court. Before Judge Goger.

Tyler R. Conklin; Sutherland Asbill & Brennan, B. Knox Dobbins, for appellant (case no. S17A0542).

Saraliene S. Durrett, for appellant (case no. S17A0543).

Paul L. Howard, Jr., District Attorney, Paige Reese Whitaker, Arthur C. Walton, Lyndsey H. Rudder, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General, for appellee.