304 Ga. 156
FINAL COPY

S18A0541.  MENZIES v. THE STATE.

GRANT, Justice.

Following a jury trial, Christina Menzies was found guilty of felony murder, criminal attempt to commit armed robbery, and related crimes in connection with the shooting death of Menzies's sister Jennifer during an attempted armed robbery.[1]  On appeal, Menzies contends that the evidence was insufficient to support the verdicts, that the trial court erred in denying her

---

[1] The attempted armed robbery and the death of Jennifer Menzies occurred on December 11, 2013.  On July 8, 2014, Christina Menzies was indicted with three others by a Rockdale County grand jury for felony murder, criminal attempt to commit armed robbery, two counts of aggravated assault, possession of a firearm during the commission of a crime, and giving a false statement.  At the conclusion of a separate trial held October 19-22, 2015, the jury found Menzies guilty of all counts of the indictment.  The trial court sentenced Menzies to life imprisonment for felony murder; twenty years' imprisonment for each of the two counts of aggravated assault, to be served concurrently with the life sentence and with each other; five years consecutive for the firearm count; and five years for giving a false statement, to be served concurrently with the sentences for felony murder and aggravated assault.  The criminal attempt to commit armed robbery count merged with the felony murder count for sentencing.  See *Culpepper v. State*, 289 Ga. 736, 737 (715 SE2d 155) (2011).  On November 9, 2015, Menzies filed a motion for new trial, which was subsequently amended through new counsel on May 3, 2017, and again on July 24, 2017.  After a hearing, the trial court denied the motion for new trial on September 22, 2017.  Menzies filed a timely notice of appeal on October 23, 2017, and the case was docketed in this Court to the term beginning in December 2017 and submitted for decision on the briefs.

motion for directed verdict at the close of the State's case, that her trial counsel was ineffective for failing to move for a mistrial in response to a comment made by the prosecuting attorney in closing argument, and that the trial court erred in failing to exclude certain statements Menzies made while alone in an interview room at the Rockdale County Sheriff's Office. None of these claims succeed, and we affirm.

## I.

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that Menzies devised a scheme to steal hair (intended to be used in hair weaves) from Kap Suk Sims; Menzies knew Sims because she had purchased hair from her on several prior occasions. Menzies recruited her sister Jennifer and co-indictee Jaquan Mareek House to join her in the robbery, which she referred to as a "hair weave jug." House subsequently enlisted his friends, co-indictees Brandon Lamothe and James Edwards, for additional assistance. The group planned to sell the hair after the robbery.

On the morning of December 11, 2013, Menzies told Sims by telephone that she wanted to meet her to buy hair, and that Sims should bring as much hair as possible because Menzies had four cousins and an aunt who were also

interested buyers.   Menzies asked Sims to come alone, but Sims refused.  Still, she agreed to meet Menzies that night.

Sims called her boyfriend, Barry Morton, and requested that he accompany her to the sale.  Morton agreed, and they made arrangements to meet Menzies later that night in the recreation area of the Fountain Crest subdivision in Rockdale County.

After meeting at Jennifer's house, Lamothe, Edwards, House, and Jennifer drove to the meeting place in one car, with Menzies driving separately in her own car. Lamothe, Edwards, and House had picked up a gun earlier that evening, and Edwards had the weapon with him.  Menzies parked her car in the parking lot for the subdivision's swimming pool while House parked nearby.  Menzies walked up to the car where House and the others sat waiting, and asked if they were ready.  Edwards pulled back the slide to cock his pistol and confirmed that they were ready, and Menzies walked back to her car in the pool parking lot.  After a few minutes, House, Edwards, and Jennifer walked toward the swimming pool, while Lamothe remained in the car in case a quick getaway was needed.

Sims and Morton arrived to find Menzies parked in a dark area of the pool parking lot.  Sims got out of Morton's truck and opened the rear door,

where she had a box of hair packs for Menzies to look through, while Morton remained in the driver's seat. Menzies told Sims that she liked the hair but that she needed to check with her cousins before buying it. Meanwhile, House, Edwards, and Jennifer had seen that Sims had a man with her, and were debating whether to go ahead with the robbery. Menzies pretended that she was texting her cousins to ask for a second opinion, but actually texted Jennifer, telling her and the others to "come on now," and that "the man in the front" was "big." Jennifer responded, "He got a gun[?]" and Menzies texted, "Idk [I don't know] but come on. Let's do this quik."

House, Edwards, and Jennifer ran toward Morton's truck. Edwards approached the open passenger door of the truck and pointed a gun at Morton, ordering him to "drop everything." Morton put his hands up in response. House thought that Edwards was pointing the gun at him and fled the scene. Morton, fearing for his life, grabbed his pistol from the seat and rolled out of the truck. Edwards shot at Morton as Morton moved toward the rear of the truck to take cover. Morton returned fire, and Edwards ran away. Sims, meanwhile, had dropped to the ground and played dead when the shooting started, thinking that Morton had been killed.

Jennifer came around the rear corner of the truck toward Morton. She was wearing dark clothing and holding up a white plastic bag, and Morton could not get a good look at her. Fearing that Jennifer was one of the robbers "coming back to finish [him] off," Morton shot her twice. Jennifer tried to crawl away, but Morton knocked her to the ground and told her not to move. He then called 911. While Morton was on the phone, Menzies pulled her car around to where Jennifer was lying and dragged her into the passenger seat. Morton told Menzies that the police and paramedics were on their way, but Menzies ignored him; she finished loading Jennifer into the car and drove away.

Based on Morton's description of her vehicle, Menzies was stopped by responding officers. Jennifer was in the front passenger seat and appeared to be dead. Paramedics took Jennifer to the hospital, but ultimately confirmed that she was dead. Menzies told police that she had been a victim of the robbery and denied that she knew Jennifer. Sergeant Daniel Lang asked Menzies to go to the sheriff's office to give a statement, and she agreed. At that point, Sgt. Lang considered her to be a victim.

While alone in the police interview room, Menzies spoke aloud to her deceased sister, saying, "Jen Jen, go back into your soul." Later, after police

realized that the victim was her sister, Sgt. Lang returned to the interview room and read Menzies her *Miranda* rights. After Sgt. Lang departed, Menzies again spoke to her dead sister, saying: "Jen Jen, if you're here with me, I'm so sorry . . . I know we didn't have an understanding before, but today I realize I do love you . . . you had the feeling to not do it . . . I shouldn't have took you, but I can't turn back time. I'm so sorry. . . . Forgive me, Jen Jen." She was arrested later the same night.

House was found by responding officers as he fled the area, and they brought him in for questioning. He admitted his involvement in the robbery after being informed that Jennifer had died, and he testified for the State at Menzies's trial.

At the crime scene, police found Edwards's 9mm pistol, five matching 9mm shell casings, and nine shell casings that matched to Morton's .40 caliber pistol. The medical examiner testified that Jennifer had suffered three gunshot wounds caused by two bullets, one of which had lethally traveled through her head and lodged in her heart.

## II.

Menzies contends that the evidence introduced at trial and summarized above was insufficient to support her convictions for attempted armed robbery,

aggravated assault, possession of a firearm during the commission of a crime, and felony murder, and that the trial court therefore erred in denying her motion for directed verdict at the close of the State's case. We do not agree.

When evaluating a challenge to the sufficiency of the evidence, we view all of the evidence admitted at trial in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which she was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013). Our limited review under the standard set out in *Jackson* leaves to the jury the resolution of conflicts in the testimony, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made "from basic facts to ultimate facts." *Musacchio v. United States*, ___ U. S. ___, ___ (136 SCt 709, 193 LE2d 639) (2016) (citation and punctuation omitted); see *Hayes*, 292 Ga. at 506. The same standard of review applies when evaluating the denial of a defendant's motion for directed verdict. See *Lewis v. State*, 296 Ga. 259, 261 (765 SE2d 911) (2014); *Joyner v. State*, 280 Ga. 37, 38-39 (622 SE2d 319) (2005).

Menzies argues that because she did not personally obtain, carry, or fire a gun, and because there was no testimony stating that Menzies saw Edwards's gun before the robbery, the State failed to prove that she possessed or used a weapon as required to prove each of the predicate felonies for the felony murder charge (attempted armed robbery, aggravated assault, and possession of a firearm during the commission of a crime). But under Georgia law, Menzies may be charged and convicted as a party to those crimes if the evidence shows that she intentionally assisted, supported, or encouraged others in committing them. See OCGA § 16-2-20 (a person who "[i]ntentionally aids or abets in the commission of the crime" or "[i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime" is a party to the crime and may be charged with and convicted of it); *Menefee v. State*, 301 Ga. 505, 508 (801 SE2d 782) (2017). And when a group of individuals join together to plan and commit a crime, each member of the criminal plot is responsible for the acts of the others — regardless of whether a particular act was part of the original plan — as long as such acts were "naturally or necessarily done" in the execution or furtherance of the common purpose. *Williams v. State*, 276 Ga. 384, 385-386 (578 SE2d 858) (2003); see also *Lebis v. State*, 302 Ga. 750, 757-758 (808 SE2d 724) (2017).

Here, the evidence showed that Menzies planned the robbery, enlisted the others to help, and arranged the meeting with Sims. She convinced Sims to bring as much hair as possible and lured Sims and Morton to a dark and secluded area. And when Morton's presence caused the others to hesitate, Menzies texted "come on now" and "[l]et's do this qui[c]k" in response. After Jennifer was shot, Menzies loaded her in the car and drove away rather than waiting for the police and paramedics, and when she was pulled over by the police, she lied about her own involvement and even denied that she knew her own sister. This evidence was more than sufficient to allow a rational trier of fact to find beyond a reasonable doubt that Menzies conspired with the others to rob Sims and intentionally aided, encouraged, and participated in the attempt to rob Sims and Morton. See *Thomas v. State*, 300 Ga. 433, 436 (796 SE2d 242) (2017) ("[C]riminal intent may be inferred from presence, companionship, and conduct before, during and after the offense.") (citation and punctuation omitted).

Accordingly, Menzies is responsible, as a party to the crime and as a co-conspirator, for the acts of her accomplices — including the possession and use of a firearm — as long as those acts were naturally or necessarily done in furtherance of the attempted robbery. See *Lebis*, 302 Ga. at 757-759; *McLeod*

*v. State*, 297 Ga. 99, 102-103 (772 SE2d 641) (2015). This is true regardless of whether the original plan for the robbery included the use of a gun. See *Hicks v. State*, 295 Ga. 268, 272-273 (759 SE2d 509) (2014). And although the jury could easily have inferred that Menzies knew about the weapon from testimony that Edwards pulled back the slide and "cocked" his pistol in front of her, even absent that kind of evidence, Menzies would still be responsible for Edwards's use of the gun as a natural or necessary part of the robbery. See *Butts v. State*, 297 Ga. 766, 770-771 (778 SE2d 205) (2015).

Menzies also contends that the evidence was insufficient to show that her actions proximately caused Jennifer's death, as required to support her felony murder conviction. "Proximate causation imposes liability for the reasonably foreseeable results of criminal conduct if there is no sufficient, independent, and unforeseen intervening cause." *Currier v. State*, 294 Ga. 392, 394 (754 SE2d 17) (2014) (citation and punctuation omitted); see OCGA § 16-5-1 (c) (defining felony murder); *State v. Jackson*, 287 Ga. 646, 649 (697 SE2d 757) (2010) ("cause" in the felony murder statute means proximate cause). In other words, the evidence admitted at trial must have been sufficient for a rational jury to find beyond a reasonable doubt that Menzies's predicate crimes "directly and materially contributed to the happening of a subsequent accruing

immediate cause of death." *Lebis*, 302 Ga. at 758 (citation and punctuation omitted). It was.

To begin, robbery is a dangerous business, and it carries the foreseeable risk that the intended victim may resist. "[I]t was reasonable to foresee that [appellant's accomplice], who was attempting an armed robbery, could be fatally wounded in attempting such a highly dangerous enterprise." *Robinson v. State*, 298 Ga. 455, 458-459 (782 SE2d 657) (2016). Here, Edwards initiated the robbery attempt by pointing his gun in Morton's face and telling him to "drop everything," and then shot at Morton when he tried to get away. This provoked Morton to return fire and led to Morton's shooting Jennifer when she appeared around the rear of the truck; he thought she was coming "to finish [him] off." The attempted armed robbery in which Menzies participated thus led in an unbroken causative chain of events to Jennifer's death. See id. (defendant's actions as party to the crime of attempted armed robbery were proximate cause of accomplice's death for purposes of felony murder conviction).

In short, the evidence presented at trial and summarized above was more than sufficient to authorize a rational trier of fact to find Menzies guilty beyond a reasonable doubt of all the crimes of which she was convicted.

III.

Menzies contends that her trial counsel provided constitutionally ineffective assistance by failing to move for a mistrial when the prosecutor made the following statement during closing argument: "And at least what you know of Christina Menzies, and what you have seen of Christina Menzies — it's nice of [Menzies's counsel] to concede things, but Ms. Menzies never has — is she might not know the truth if it hit her in the backside." On appeal, Menzies asserts that this portion of the State's argument was an improper comment on her failure to testify at trial. At the motion for new trial hearing, Menzies's trial counsel initially testified that he did not believe the prosecutor's comment to be objectionable, either at the time of trial or upon re-reading the comment at the motion for new trial hearing. After further questioning, however, trial counsel reconsidered, saying, "Quite honestly, if I think about it more, if it is objectionable, it's probably so egregious that it wouldn't require an objection. I am not sure it's there, but that is the idea."

But that conclusion, whatever it may mean, is not enough. In order to prevail on an ineffective assistance of counsel claim, a defendant must show

both that counsel's performance was objectively deficient and that the deficient performance prejudiced the defense — that is, that there is a reasonable probability that counsel's errors affected the outcome of the trial. See *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984); *Scott v. State*, 301 Ga. 573, 575 (802 SE2d 211) (2017). To meet the first prong of the *Strickland* test, Menzies must overcome the "strong presumption" that trial counsel's performance was adequate and that his decisions were "made in the exercise of reasonable professional judgment." *Marshall v. State*, 297 Ga. 445, 448 (774 SE2d 675) (2015) (citation and punctuation omitted); see *Strickland*, 466 U. S. at 687-688. And if the defendant fails to satisfy either prong of the *Strickland* test, we need not address the other prong. See *Lupoe v. State*, 300 Ga. 233, 240 (794 SE2d 67) (2016).

A prosecutor's argument will be deemed an improper comment on the accused's right to remain silent if either "the prosecutor's manifest intention was to do just that," or "the remarks were such that a jury would naturally and necessarily take the remarks to be a comment on the accused's right to remain silent and not to testify." *Kilgore v. State*, 300 Ga. 429, 432 (796 SE2d 290) (2017). Here, as Menzies's trial counsel acknowledged at the motion for new

trial hearing, the prosecutor's remarks were not intended as a comment on Menzies's decision not to testify. Instead, they were more naturally seen as a comment on Menzies's recorded statement to police, which was played for the jury and in which Menzies claimed that she was a victim of the robbery and that she did not know her sister. Because the prosecutor's remarks did not rise to the level of prosecutorial misconduct, trial counsel's failure to object and move for a mistrial did not constitute deficient performance, and Menzies's ineffective assistance of counsel claim fails. See *Lampley v. State*, 284 Ga. 37, 38 (663 SE2d 184) (2008).

IV.

Finally, Menzies contends that the trial court erred in failing to suppress the statements she directed to her deceased sister while she sat alone in the interview room at the Rockdale County Sheriff's Office. Menzies argues that both statements should have been suppressed because she was unaware that she was being video recorded and had a reasonable expectation that her statements were private. And she argues that the first statement, in which she said, "Jen Jen, go back into your soul," should have been suppressed on the additional ground that she was detained to the degree associated with a formal

arrest, but had not yet been advised of her *Miranda* rights.[2]  We disagree on both fronts.

Menzies appears to argue that the video recording of her statements constituted an unlawful search and seizure because she reasonably expected those statements to be private.  But to make out a claim for an unlawful search under the Fourth Amendment, a defendant must show "'that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'"  *Smith v. State*, 284 Ga. 17, 21 (663 SE2d 142) (2008) (quoting *Minnesota v. Carter*, 525 U. S. 83, 88 (119 SCt 469, 142 LE2d 373) (1998)).  And we have previously considered the precise question Menzies raises here, whether defendants have a reasonable expectation of privacy in a police interview room.  They do not.  See *Rashid v. State*, 292 Ga. 414, 418-419 (737 SE2d 692) (2013).  Because Menzies had no reasonable expectation of privacy, she cannot establish a Fourth Amendment violation, and the trial court did not err in denying her motion to suppress her statements to her deceased sister on that ground.

---

[2] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

As for Menzies's claim that her first statement to her sister should have been suppressed because she had not yet received *Miranda* warnings, we again disagree. We reiterate the well-understood point that *Miranda* warnings are required only when a suspect is subjected to interrogation while in the custody of law enforcement. See *Velazquez v. State*, 282 Ga. 871, 877-878 (655 SE2d 806) (2008) ("[A] defendant's voluntary and spontaneous outburst not made in response to custodial questioning or interrogation is admissible at trial."); *State v. Davison*, 280 Ga. 84, 86-87 (623 SE2d 500) (2005). And the question of whether a statement was made in response to interrogation or was volunteered is a question of fact, and the trial court's resolution of this issue will be upheld unless it is clearly erroneous. See *Velazquez*, 282 Ga. at 877.

Here, there was no interrogation. "Interrogation for the purposes of *Miranda* warnings encompasses express questioning and words and actions that officers should know are reasonably likely to elicit an incriminating response from the subject." *Waters v. State*, 281 Ga. 119, 122 (636 SE2d 538) (2006). Menzies was sitting alone in the interview room when she made both statements; no law enforcement officer was present, much less interrogating her. And statements made spontaneously, rather than in response to interrogation, are not subject to exclusion on the ground that the suspect has

not received *Miranda* warnings, regardless of whether she was in custody at the time of the statements.[3]   See id. at 121-122.   Thus, Menzies's first spontaneous statement to her deceased sister was not rendered inadmissible by the fact that she had not yet been advised of her *Miranda* rights.

Judgment affirmed.  All the Justices concur.

---

[3] It appears that at the time of her first statement Menzies was at the station as a victim, rather than as a suspect.  But because the determination of whether Menzies was in police custody at the time she made her spontaneous statements makes no difference to the voluntariness or admissibility of the statements in this context, we need not actually consider that question here.

Decided June 29, 2018.

Murder. Rockdale Superior Court. Before Judge Mumford.

Patricia M. Moon, for appellant.

Alisha A. Johnson, District Attorney, Alicia C. Gant, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason M. Rea, Assistant Attorney General, for appellee.