**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: August 12, 2025

S25A0765.  WILLIAMS v. THE STATE.

PETERSON, Chief Justice.

Appellant Carl Williams challenges his convictions for malice murder and other crimes in connection with the shooting death of his fiancée Doninjae Jackson-Neals. Williams argues that trial counsel was ineffective by failing to object to: (1) Jackson-Neals's uncle's trial testimony that Williams was "the type of dude that will kill you"; (2) the State repeating the testimony of Jackson-Neals's uncle during closing arguments; (3) comments made by the State during its opening statement pertaining to what it expected Jackson-Neals's uncle to testify to; and (4) the State's remarks during its opening statement that Williams initially declined to speak to law enforcement when he was detained.

We conclude that Williams failed to preserve his claims

regarding the victim's uncle's trial testimony and comments made by the State about that testimony during its closing argument. And he has failed to show prejudice as to his remaining claims regarding the comments made by the State during its opening statement. Accordingly, we affirm.[1]

1. The evidence at trial showed that Williams fatally shot Jackson-Neals on December 2, 2017, at the couple's apartment in DeKalb County. The couple began dating in April 2017, and

---

[1] The shooting occurred on December 2, 2017. On February 27, 2018, a DeKalb County grand jury indicted Williams for malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony. After Williams's first trial ended in a mistrial on October 25, 2018, a second trial was held from April 17 to 19, 2019, and Williams was found guilty on all counts. On April 25, 2019, the trial court sentenced Williams to life imprisonment with the possibility of parole for malice murder, twenty years imprisonment for aggravated assault, and five years imprisonment for possession of a firearm during the commission of a felony The felony murder conviction was vacated by operation of law. On May 13, 2019, Williams timely filed a motion for new trial, which he amended with new counsel on March 26, 2024. After a hearing on March 27, 2024, Williams filed a post-hearing brief, asserting that the trial court erred by failing to merge the aggravated assault conviction into the malice murder charge. On May 23, 2024, the trial court entered its order denying Williams's motion for new trial on the substantive grounds raised, but it granted the motion as to the merger issue. The trial court stated that "an amended sentence will be produced," but none appears in the record. Nothing in this opinion precludes the trial court from re-sentencing Williams to correct the merger error. Williams filed a timely notice of appeal, and the case was docketed in this Court for the term beginning in April 2025 and submitted for a decision on the briefs.

Jackson-Neals moved in with Williams in October 2017. The couple had a volatile relationship, as shown, in part, by text messages.[2] For example, on September 17, 2017, Williams's phone texted Jackson-Neals's phone, "fix ya f**kin attitude b4 i fix it for u." On September 25, following an argument, Williams's phone texted Jackson-Neals's phone:

> So quick to assume sum shyt when u they ONLY person f**kin around in dis relationship thinkin im stupid bruh all them excuses about y u not answering when i already knew u out doin otha shyt do i giva f**k no because im use to being lied to use to the pain but i see where i stand wit you nd thats fine[.]

In a text message sent from Jackson-Neals's phone to Williams's phone on October 3, 2017, it stated, "I'm tired of arguing and f**king fighting with yo a** bro. it's like every time it's the same sh*t but in a different f**king way. one minute we good and happy next minute u ready to kill my a** and shoot my house up . . . ." On October 18, Williams's phone texted Jackson-Neals's phone, "Dat shyt dead keep

---

[2] At trial, an investigator read numerous text messages between Williams's phone and Jackson-Neals's phone that showed angry and volatile exchanges. On cross-examination, the investigator read other text messages exchanged between the couple's phones that were positive in tone.

playin all yall gone be dead and dats my word bruh im not getting hurt again f**k dat[.]"

Prior to Jackson-Neals moving in with Williams, Williams arrived unannounced at the home where Jackson-Neals lived with several relatives, including her uncle Caprice Neals. Jackson-Neals asked Caprice to ask Williams to leave. Williams asked Caprice to ask Jackson-Neals to talk with Williams, but Caprice declined to do so, and Williams left after several minutes. Caprice testified at trial that, after Williams left the home, Caprice told Jackson-Neals that "she need to leave [Williams] alone. . . . [Williams] will be the type of dude that will kill you."

A few days before the shooting, Williams gave Jackson-Neals a gun, and the day before the shooting, Williams sent Jackson-Neals's mother a text message explaining that he gave the gun to Jackson-Neals so she would be safe when he was not around. On the morning of the shooting, the couple's downstairs neighbor heard sounds of a struggle from the couple's apartment around 8:00 a.m. The neighbor described the noise as "rumbling, like just rolling around, maybe

tumbling and tossing. . . . It sound[ed] like people were tussling . . . maybe like tugging, pulling, like rolling. It didn't sound as if anybody was, like, on their feet." The noises "went on for a little while, and then there was a sudden, like, [f]**k, or it was something — like something happened. Something went wrong." The neighbor looked out of her window and saw Williams run down the stairs, throw a white bowl in a dumpster, and continue to walk along a "shortcut" between buildings in the apartment complex. The neighbor testified that Williams was wearing a grey tank top and basketball shorts. Less than 30 minutes later, the neighbor was waiting outside her apartment when Williams walked by. According to the neighbor, Williams was wearing a black and red jacket, said "hey," and did not appear to be upset.

Around 10:00 a.m. that morning, Williams called 911. The recording was admitted into evidence and played at trial. During the call, Williams told the operator that he had accidentally shot his girlfriend in the head; that they were playing with a gun and he did not know it was loaded; that he threw the gun away in a nearby

5

creek bed; and that he threw a second gun in a black bag over a fence. When officers arrived, the apartment door was locked. After speaking with the 911 operator, officers learned where Williams was and went to his location in the same apartment complex. Williams appeared to be "out of it" and had blood on his shirt, face, and chest. Williams gave the officers the key to his apartment, and the officers detained him. Upon entering Williams's apartment, officers discovered Jackson-Neals lying on the bed. She had a gunshot wound to the right side of her forehead, just above the right eye. She was pronounced dead at the scene. The wound was a "pressed contact" wound, meaning that the barrel of the gun was pressed against Jackson-Neals's head when it was fired.

Williams was taken into custody and, later that day, gave a statement that was audio-recorded and played at trial. In his statement, he told officers that he accidentally shot Jackson-Neals while he was teaching her how to use the gun and demonstrating to her what she should do if she was robbed at gunpoint. He said that he and Jackson-Neals were sitting on the bed and that he was

6

pointing his gun at her when Jackson-Neals slapped his hand, and the gun went off. Williams was insistent that the gun was at least two to five inches from her face and that he never put the muzzle of the gun to Jackson-Neals's head. He also insisted that they had not been arguing that morning and that they did not argue at all, they "don't have reasons to argue," and had "no conflicts at all."

A firearms examiner testified that the bullet recovered from Jackson-Neals's body during the autopsy was fired from the gun that officers recovered from the creek bed. That gun had what appeared to be blood on the slide and on the end of the barrel.

In his defense, Williams presented an expert in firearm safety who reviewed two videos showing Williams handling a handgun — one in which he had a gun in his waistband while playing with his young daughter and briefly pointed the gun at the camera and one in which he showed Jackson-Neals how to shoot a handgun. The expert opined that Williams was not demonstrating proper gun safety techniques.

2. Williams raises four claims of ineffective assistance of

counsel. We conclude that as to two of his claims, Williams has not preserved them for appellate review by this Court and, as to the remaining claims, Williams has not shown prejudice.

To prove his claims of ineffective assistance of counsel, Williams must prove both that his attorney's performance was professionally deficient and that the deficiency resulted in prejudice to Williams's case. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). If Williams fails to meet the burden of proving either prong of the *Strickland* test, "we need not examine the other prong." *Moore v. State*, 307 Ga. 290, 298 (6) (835 SE2d 610) (2019) (citation and punctuation omitted).

To establish deficient performance, Williams must show that his attorney's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. See *Strickland*, 466 U.S. at 687-690 (III) (A). To establish the required prejudice, Williams must show that but for his attorney's unprofessional errors, there is a "reasonable probability" that the result of the proceeding would have

been different. Id. at 694 (III) (B). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." *Payne v. State*, 314 Ga. 322, 329 (3) (877 SE2d 202) (2022) (citation and punctuation omitted).

(a) Williams asserts that his trial counsel was ineffective for failing to object to Caprice's testimony that he told Jackson-Neals that Williams is "the type of dude that will kill" her and for failing to object to the State repeating Caprice's testimony during its closing arguments.

Williams, however, failed to raise claims of ineffective assistance of counsel on these grounds in his first opportunity to do so — in his motion for new trial, as amended by new counsel, or at the hearing on that motion — and the trial court never ruled on these grounds. Accordingly, these claims are not preserved for appellate review by this Court. See *Vivian v. State*, 312 Ga. 268, 274

(2) (b) (862 SE2d 138) (2021) (concluding that the defendant failed to preserve for appellate review his claims of ineffective assistance of counsel where it was not raised at defendant's first opportunity where he had new counsel); *Lopez v. State*, 310 Ga. 529, 535 (3) (e) (852 SE2d 547) (2020) (same).

(b) Williams next contends that trial counsel was deficient for failing to object to the State's remark during opening statements that the jury would hear testimony from Caprice that he told Jackson-Neals that Williams is "the type of dude that will kill" her.

Generally, a prosecutor may state in opening statements what she expects the evidence to show. See *Menefee v. State*, 301 Ga. 505, 511 (4) (a) (801 SE2d 782) (2017) ("[W]hen making opening statements, the prosecutor is allowed to state what the evidence is expected to show[,] and the content of such statements is within the broad discretion of the trial court." (citation omitted)). But even if Williams's trial counsel was deficient for failing to object to the State's comments about Caprice's anticipated testimony, Williams has failed to show prejudice. As an initial matter, the trial court

properly instructed the jury that statements by counsel were not evidence. See *Blalock v. State*, 320 Ga. 694, 704 (2) (c) (911 SE2d 628) (2025) (noting that "prosecutor's statements were not evidence, and the trial court properly instructed the jury as much," in concluding that the defendant failed to demonstrate prejudice stemming from counsel's failure to object to the prosecutor's purportedly improper remarks in closing arguments (citation and punctuation omitted)). Additionally, the evidence the State told the jury would be introduced was in fact introduced and no objection was made to it. See *State v. Spratlin*, 305 Ga. 585, 595 (2) (b) (826 SE2d 36) (2019) (concluding that there was no prejudice under *Strickland*, in part, because the State's improper comments during closing arguments were "somewhat cumulative" of other, unobjected-to testimony presented at trial); see generally *Payne*, 314 Ga. at 330 (3) (b) (holding that defendant failed to show prejudice resulting from failure to object to certain testimony that was cumulative of other evidence presented at trial and the admission of which defendant did not contest).

Williams also fails to demonstrate prejudice because there was strong evidence supporting his guilt. There was evidence here that the couple's downstairs neighbor heard what sounded "like people were tussling" in their apartment prior to the shooting, undermining Williams's claim that he and Jackson-Neals were not arguing that morning and were sitting on the bed when he accidentally shot her; that Williams lied to investigators by claiming that he and Jackson-Neals never argued, despite text message evidence showing several volatile and angry exchanges between the couple; that Williams disposed of the gun used to kill Jackson-Neals and waited at least an hour before calling 911 to report the shooting; and that, although Williams insisted that the gun used to kill Jackson-Neals was at least two to five inches from her face and that he never put the muzzle of the gun to Jackson-Neals's head, the gun in fact was pressed against Jackson-Neals's head when it was fired. See *Kingdom v. State*, 321 Ga. 363, 369 (4) (914 SE2d 778) (2025) (concluding that the defendant could not show prejudice for his ineffective assistance of counsel claim because the evidence of his

12

guilt was overwhelming); *Turner v. State*, 308 Ga. 537, 540-541 (2) (a) (842 SE2d 40) (2020) (same). Therefore, this claim fails.

(c) Williams also argues that trial counsel was deficient for failing to object to comments the State made during opening statements regarding anticipated testimony from an investigator about Williams declining to speak with investigators when he was detained. For the same reasons articulated in Division 2 (b), this claim fails.

Without deciding whether trial counsel was deficient for failing to object to the State's comments during opening statements about Williams choosing to exercise his constitutional right to remain silent when questioned by investigators, Williams cannot show that he was prejudiced by any deficiency by trial counsel. Much like the remarks that the State made in opening statements regarding Caprice's anticipated testimony, the State was permitted to comment on what it expected the evidence to show, see *Menefee*, 301 Ga. at 511 (4) (a), and comments regarding Williams's refusal to speak with investigators upon being detained were not objected to

13

at trial.[3] See *Spratlin*, 305 Ga. at 595 (2) (b). And, as noted above in Division 2 (b), because the trial court instructed the jury that comments made during opening statements were not evidence and there was other strong evidence supporting his guilt, Williams cannot show that he was prejudiced. Thus, this claim fails.

*Judgment affirmed. All the Justices concur, except Land, J., not participating.*

---

[3] We express no opinion as to whether the trial court would have sustained an objection to such comments.