301 Ga. 573
FINAL COPY

S17A0524. SCOTT v. THE STATE.

NAHMIAS, Justice.

Appellant Windy Scott ("Appellant") challenges her convictions for malice murder and a gun crime in connection with the shooting death of William Scott ("Scott"). Appellant claims that she was denied the effective assistance of counsel for her trial. We conclude that Appellant's trial counsel performed deficiently in not seeking expert assistance in evaluating her mental condition at the time of shooting and at the time of trial; however, Appellant has not shown that but for this deficiency, there is a reasonable probability that the outcome of the trial proceeding would have been more favorable to her. Accordingly, we affirm.[1]

---

[1] Scott was killed on February 21, 2010. On April 13, 2010, a Richmond County grand jury indicted Appellant for malice murder, felony murder, and possession of a firearm during the commission of a crime. At a trial from November 15-17, 2010, the jury found Appellant guilty of all charges. The felony murder verdict, which the trial court purported to merge into the malice murder verdict, was actually vacated by operation of law, see Malcolm v. State, 263 Ga. 369, 371-372 (434 SE2d 479) (1993), and on November 18, 2010, the court sentenced Appellant to serve life in prison for malice murder and a consecutive term of five years for the firearm conviction. On December 10, 2010, Appellant filed a motion for new trial, which she amended with new counsel on June 16, 2014. On August 6, 2014, the trial court ordered a mental evaluation of Appellant, and

1.     Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. Appellant and Scott, who were first cousins, had a tumultuous romantic relationship that began in the late 1980s and produced two children. Scott's infidelities were a recurring source of tension, and in 1996 Appellant stabbed Scott during an argument about his cheating. Appellant then received inpatient psychiatric treatment.

Many years later, on February 17, 2010, Appellant confronted Scott as he was leaving his mother's house with another woman, and Scott told Appellant that he wanted to end their relationship. For the next few days, Appellant had trouble getting in touch with him. On Sunday morning, February 21, she took a loaded gun to the parking lot of Scott's employer to make him talk to her at the end of his shift. She showed Scott the gun, and he persuaded her to put it in her car while they talked. A co-worker of Scott who is a minister walked by, and Scott asked him to speak with Appellant, telling him that she had come with a gun to kill herself. The minister then counseled and prayed with Appellant for 15 to 20 minutes.

after an evidentiary hearing on May 27, 2015, the court denied her new trial motion on July 1, 2015. She filed a timely notice of appeal, and the case was docketed in this Court for the term beginning in December 2016 and submitted for decision on the briefs.

Appellant and Scott left in separate cars traveling in the same direction. As they drove, Appellant called Scott by cell phone and asked him if they were okay; he cursed at her and said there was no way that he was going to get back together with her. Appellant then followed Scott to a gas station, where he parked next to a pump and got out of his car. Appellant parked, got out of her car, and began arguing with Scott in front of several witnesses who were watching from inside the gas station convenience store. Appellant then pulled out her gun and began chasing Scott around the gas pumps. He picked up a plastic trash can to shield himself, and the chase continued until Scott fell to his knees, facing Appellant. She stepped forward and fired one shot through the trash can into Scott's forehead, killing him. Appellant then put the gun down on the hood of Scott's car and lay on the ground next to him.

A witness had already called 911, and sheriff's officers were on the scene within minutes. When the first officer arrived, Appellant was crying and screaming that she was going to kill herself. She said, "I had to do it. I had to do it. He was the love of my life." And she begged the officer, "Please, shoot me! I don't want to live. Shoot me. Shoot me." Appellant was arrested and taken to the sheriff's office, where she gave a statement, which was played for

3

the jury at trial, in which she admitted that she shot Scott because he was calling her names.

At trial, Appellant testified that the gun had accidentally discharged. The defense theory was that the gun fired accidentally as Appellant chased Scott and the bullet ricocheted off an overhang and back down through the trash can and into Scott's head, killing him. The trial court declined Appellant's request to charge the jury on accident, but instructed the jury on the lesser included offense of involuntary manslaughter based on reckless conduct. The jury found Appellant guilty as charged.

Appellant does not contest the legal sufficiency of the evidence supporting her convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which she was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or

4

inconsistencies in the evidence.'" (citations omitted)).

2. Appellant contends that her trial counsel provided ineffective assistance. A convicted defendant's claim that her attorney's assistance was so defective as to require reversal of her conviction must prove both that the attorney's performance was professionally deficient and that this deficiency resulted in prejudice to her case. See Strickland v. Washington, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, the defendant must show that her counsel's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. See id. at 687-690. To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "This burden, though not impossible to carry, is a heavy one." Arnold v. State, 292 Ga. 268, 269 (737 SE2d 98) (2013). See Kimmelman v. Morrison, 477 U. S. 365, 381-382 (106 SCt 2574, 91 LE2d 305) (1986).

Appellant approaches her ineffective assistance claim from several angles.

5

However, the gist of her claim is that her trial counsel was professionally deficient in failing to consult with a mental health expert about the case, and that but for this error, there is a reasonable probability that Appellant would have been found incompetent to stand trial or would have been found not guilty by reason of insanity or guilty but mentally ill. See former OCGA §§ 17-7-130, 17-7-131.[2] We agree with Appellant as to deficient performance, but not as to prejudice.

(a)  *Deficient performance.*  Soon after Appellant was indicted, her trial counsel requested a mental examination in light of her repeated requests to the responding officers to shoot her. By the time the trial started seven months later, however, counsel had decided to forgo a mental evaluation and had so informed the prosecutor. The prosecutor raised the issue on the first day of trial to ensure that the waiver of a mental evaluation was on the record. Appellant's counsel explained to the court that he initially requested a mental evaluation out of an abundance of caution but had since spoken with Appellant on several occasions and was no longer concerned about her competence to stand trial. He

---

[2]  These statutes have been amended since Appellant's crimes and trial. We rely on the versions in effect at the relevant times.

6

added, "the other issue of course would be . . . whether or not we were going to raise an issue of insanity at the time of the act. We are not raising that issue, . . . [a]nd therefore yes we . . . do waive the mental evaluation."

At the motion for new trial hearing several years later, trial counsel testified that at times during his representation of Appellant, her family suggested to him that she had mental illness and gave him mental health records for Appellant. Those records showed that Appellant was admitted to a psychiatric hospital in July 1996 after stabbing Scott and that she reported hearing a voice that told her to "kill . . . kill . . ."; the medical staff at the psychiatric hospital diagnosed Appellant with "Major depressive disorder, single episode, severe, with psychotic features," put her on antidepressants and a powerful antipsychotic medication that seemed to alleviate her symptoms, and discharged her into police custody after eight days.[3]

Trial counsel testified that in response to this information, he spoke to Appellant and observed how she interacted with him "as far as knowing what

_____

[3] The record on appeal provides only a few more details about the July 1996 incident, none of which are relevant here. The record does not indicate the extent of Scott's injury from the stabbing, whether Appellant (or Scott) was ever indicted as a result of the incident, or the disposition of any such charges.

she was charged with, whether she could assist me in the defense of her case." He said that he "balanced the possibility of raising a defense of insanity against the defense that [Appellant] and I ultimately decided to raise," which was "that she did not intentionally shoot directly at" Scott, "that the gun had actually gone off accidentally," and that the bullet struck an overhang and "ricocheted [down] through the trash can" and "unfortunately struck" Scott, killing him. Counsel acknowledged that he had no medical training in the diagnosis of mental illnesses, that he did not contact any of Appellant's healthcare providers to discuss her mental health issues, and that he did not consult with any other mental health expert about the case before withdrawing the request for a mental evaluation.

We are cognizant of the "distorting effects of hindsight" and the need to "reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" in determining whether a defendant has met her burden of proving professionally deficient performance. Strickland, 466 U. S. at 689 (punctuation omitted). Nevertheless, we conclude that under the circumstances of this case, Appellant's trial counsel could not reasonably decide to forgo seeking the assistance of a mental health expert. It

8

is undisputed — and clear from a responding officer's dashboard camera recording — that Appellant was extraordinarily distraught after shooting Scott and repeatedly implored responding officers to shoot and kill her, and this information prompted trial counsel to request a mental evaluation of Appellant. As the case moved forward, Appellant's family suggested to trial counsel that she had mental illness and gave him medical records supporting their concerns. The medical records showed that Appellant was hospitalized for eight days in 1996 after stabbing the same man that she was on trial for shooting to death. They also showed that after Appellant was arrested for the stabbing in 1996, she reported hearing a voice telling her to "kill," which the medical staff of the psychiatric hospital took seriously enough to put her on an antipsychotic medication, which appeared to be effective.

Despite these facts, trial counsel did not contact any of Appellant's treatment providers or consult with any other mental health expert to assist him in evaluating her mental condition at the time of the shooting or at the time of trial. Instead, he relied on his own impressions of Appellant to decide that no further investigation into her mental health was necessary, and he accordingly withdrew the request for a mental evaluation. Under these circumstances, trial

9

counsel "could not reasonably conclude 'that further investigation would have been fruitless.'" Martin v. Barrett, 279 Ga. 593, 595 (619 SE2d 656) (2005) (quoting Wiggins v. Smith, 529 U.S. 510, 525 (123 SCt 2527, 156 LE2d 471) (2003)). Appellant therefore has met her burden to show deficient performance in trial counsel's investigation of the case.

The trial court ruled to the contrary, reasoning that trial counsel was not professionally deficient in withdrawing the mental evaluation request because the State's mental health expert who examined Appellant after trial testified at the motion for new trial hearing that while Appellant was suffering from major depressive disorder at the time of the shooting, she was not suffering from a psychotic disorder. This reasoning, however, relies on hindsight and therefore is unsound. See Strickland, 466 U. S. at 689. Trial counsel obviously did not have the benefit of the opinion of the State's expert — or of any other mental health expert — when deciding whether to withdraw the mental evaluation request at the start of Appellant's trial years earlier. See id. at 690 (holding that a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct").

The State's defense of trial counsel's decision to forgo expert assistance

10

fares no better.  The State argues that counsel made a reasonable decision to pursue the alternative strategy of appealing to the jury's sympathy for Appellant's unfortunate life and tumultuous relationship with Scott and arguing lack of criminal intent based on her assertion that the gun accidentally discharged.  But as the United States Supreme Court explained in Strickland and reiterated in Wiggins, while "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,'" "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" Wiggins, 529 U. S. at 521 (quoting Strickland, 466 U. S. at 690-691).  Under the circumstances of this case, including trial counsel's awareness of Appellant's reported history of serious mental illness related to violence against the same person on a prior occasion, he was required to seek expert assistance and could not rely solely on his own non-expert impressions of his client's present and past mental condition in deciding on a defense strategy.  See Martin, 279 Ga. at 594-595 (upholding a claim of deficient performance where trial counsel were aware of the defendant's recent hospitalization and treatment for mental illness but relied

11

only on their own discussions with him to decide that he was in good mental health).[4]

(b)    *Prejudice.*  The question then becomes whether Appellant met her burden to prove that if trial counsel had consulted a mental health expert, there is a reasonable probability that he would not have withdrawn the request for a mental evaluation and the resulting mental evaluation would have led to a more favorable outcome for her.  See Wiggins, 539 U. S. at 534 ("In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense." (citing Strickland, 466 U. S. at 692).  The State does not dispute that if Appellant's trial counsel had not withdrawn the request for a mental evaluation, there is a reasonable probability that the trial court would have ordered one.  In this connection, although certainly not dispositive, see Strickland, 466 U. S. at 694-

---

[4]  Compare Arnold, 292 Ga. at 270-272 (rejecting a claim of deficient performance where trial counsel not only drew upon her own experience as a criminal defense lawyer and saw no indication in her interactions with the defendant that further mental health investigation or evaluation would be worthwhile, but also obtained and reviewed mental health records showing a prior hospitalization for major depressive disorder and treatment with antidepressants and interviewed the defendant's treating psychiatrist); McKiernan v. State, 288 Ga. 140, 141-142 (702 SE2d 170) (2010) (rejecting a claim of deficient performance where plea counsel interviewed the defendant's treating psychiatrist, who said that the defendant had been treated with antidepressants for depression and had not displayed any signs of psychosis).

12

695, it is notable that the trial judge who granted Appellant's request for a mental evaluation in connection with her new trial motion was the same judge who presided over her trial. Nevertheless, Appellant has not met her burden to demonstrate a reasonable probability that a mental evaluation would have resulted in Appellant's being found incompetent to stand trial or being found not guilty by reason of insanity or guilty but mentally ill. See OCGA § 17-7-131 (c).[5] In considering this question, we presume that had Appellant's trial counsel obtained a mental evaluation, it would have been the one that Appellant's new counsel obtained during the motion for new trial proceeding. See, e.g., Wiggins, 539 U.S. at 535-536; Martin, 279 Ga. at 595-596. See also Valentine v. State, 293 Ga. 533, 537 (748 SE2d 437) (2013) (explaining that a claim of prejudice

---

[5] At the time of Appellant's trial, OCGA § 17-7-131 (c) said:

In all criminal trials in any of the courts of this state wherein an accused shall contend that he was insane or otherwise mentally incompetent under the law at the time the act or acts charged against him were committed, the trial judge shall instruct the jury that they may consider, in addition to verdicts of "guilty" and "not guilty," the additional verdicts of "not guilty by reason of insanity at the time of the crime" [and] "guilty but mentally ill at the time of the crime" . . . .

Appellant does not contend that a mental evaluation would have prompted her to attempt to enter a plea of guilty but mentally ill at the time of the crimes, much less that there is a reasonable probability that such a plea would have been agreed to by the prosecution and accepted by the trial court. See former OCGA § 17-7-131 (b) (2) (barring the acceptance of a plea of guilty but mentally ill until the defendant has undergone examination by a licensed psychologist or psychiatrist and the court has examined the reports, held a hearing on the issue of the defendant's mental condition, and is satisfied that there is a factual basis that the defendant was mentally ill at the time of the offense).

from deficient performance fails as speculative unless the defendant produces or proffers the evidence that competent performance allegedly would have produced).

Regarding competency, the trial court made an explicit finding in its order denying the new trial motion that Appellant was "legally competent at the time of trial," and the testimony and report of the State's mental health expert, along with trial counsel's testimony and the court's own observations and interactions with Appellant before and during the trial, provided evidence to support the court's finding. See Perkins v. Hall, 288 Ga. 810, 819-820, 823-824 (708 SE2d 335) (2011); Martin, 279 Ga. at 595. The trial court was of course entitled to credit the State's expert's testimony and report over the views of the expert Appellant found after trial. See Watkins v. State, 285 Ga. 355, 357 (676 SE2d 196) (2009) ("'[I]t is the function of the trial court at the hearing on the motion for new trial to determine witness credibility and to resolve any conflicts in the testimony.'" (citation omitted)). Under these circumstances, Appellant has failed to show that but for her trial counsel's deficient performance, there is a reasonable probability that she would have been found not competent to stand trial.

A mental health defense strategy would have been a hard sell in this case for several reasons, beginning with the organized nature of and apparent motivation for the crimes: Appellant brought a loaded gun to the original meeting with the victim but did not shoot him during that encounter, instead following him in her car, calling him, and only after he cursed at her and told her that there was no way they were getting back together, parked near him and then chased him around the gas station before shooting him. Appellant never claimed before trial that she shot Scott as a result of mental illness. While she was suicidal on the day of the shooting, she said and did nothing in her interactions with the minister before the crimes or the police after the shooting to suggest that she was suffering from psychosis or did not know what she had done was wrong. And according to her trial counsel, "Appellant was insistent from day one the gun accidentally discharged."

In addition, nothing in the record indicates that Appellant received any diagnosis of or treatment for mental illness, much less psychotic incidents, for more than a decade before these crimes, or that Appellant had any trouble with the law during that extended period of time. Finally, the trial court explicitly adopted the findings of the State's mental health expert that Appellant's 1996

15

diagnosis "was made during a time [when she] was facing potential legal charges" and she was faking symptoms of psychosis when he evaluated her when she was seeking to reverse her convictions in this case. As trial counsel explained at the motion for new trial hearing, "jurors are very apprehensive about mental health defenses," which are unlikely to be successful "unless you have very strong competent witnesses who can firmly establish [those defenses] to the satisfaction of the jurors."

For these reasons, we conclude that Appellant has failed to demonstrate a reasonable probability that the jury would have returned a verdict of not guilty by reason of insanity. And while there is a chance that a mental health defense would have resulted in a verdict of guilty but mentally ill, Appellant has not shown that verdict — unlike an insanity verdict that results in a defendant not being incarcerated in a penal facility — would have been more favorable for her. There is no evidence even now that Appellant would have wanted such a verdict. In a case like this one, the availability of a guilty but mentally ill verdict at trial benefits the State more than the defendant, as it gives the jury an outlet for sympathy for a defendant's mental illness without giving the defendant a shorter sentence or even necessarily one served under different conditions. See

16

former OCGA § 17-7-131 (g) (1) ("Whenever a defendant is found guilty but mentally ill at the time of a felony . . . , the court shall sentence him or her in the same manner as a defendant found guilty of the offense . . . . A defendant who is found guilty but mentally ill at the time of the felony . . . shall be committed to an appropriate penal facility and shall be evaluated then treated, if indicated, within the limits of state funds appropriated therefor, in such manner as is psychiatrically indicated for his or her mental illness . . . .").

In short, Appellant has not met her burden to show prejudice, so her claim of ineffective assistance of counsel fails.

Judgment affirmed. All the Justices concur.

Decided June 26, 2017.

Murder. Richmond Superior Court. Before Judge Brown.

Fleming & Nelson, Kurt A. Worthington, for appellant.

Ashley Wright, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General, for appellee.