309 Ga. 850
FINAL COPY

S20A0884.  GRAY v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Roshun Gray was convicted of malice murder and two firearm offenses in connection with the shooting death of Ferderian Bennett. In this appeal, Appellant contends that he was legally incompetent to stand trial and that his trial counsel provided ineffective assistance by failing to investigate his incompetency. Both of those claims are meritless, so we affirm.[1]

---

[1] Bennett was killed on January 14, 2012. In August 2012, a Fulton County grand jury indicted Appellant for malice murder, two counts of felony murder, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. In February 2015, Appellant was reindicted for those same crimes. At a trial from June 1 to 5, 2015, the jury found Appellant guilty of all charges. The trial court sentenced him to serve life in prison for malice murder and five consecutive years for each of the firearm counts. The aggravated assault count merged into the malice murder conviction. Although the trial court also purported to merge the felony murder counts, those counts were actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 374 (434 SE2d 479) (1993). Through new counsel, Appellant filed a timely motion for new trial in July 2015; he then obtained different counsel, who amended the motion in September 2017 and January 2018. After an evidentiary hearing in May 2019, the trial court denied the motion in October 2019. Appellant filed a timely notice of appeal, and the case was docketed to this Court's April 2020 term and submitted for decision on the briefs.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. On the night of January 14, 2012, Appellant went to a club in Atlanta with his brother Antoninne Sagoes and Sagoes's brother-in-law Jeremy White. White had fought with Bennett, the owner of the club, outside the club earlier that night. After Bennett came outside and argued with White again, two witnesses saw Appellant, who was a convicted felon, pull out a gun and fire a shot toward Bennett. One of the witnesses saw Appellant fire a second shot before he and his associates fled.

Bennett, who had been shot once, was taken to a hospital, where he soon died. Investigators did not find any weapons at the crime scene, and several witnesses testified that they did not see Bennett with a gun that night. Investigators later interviewed Sagoes, who said that although he did not see Appellant shoot Bennett, after the shooting he asked Appellant what happened, and Appellant replied that he saw Bennett pull out a pistol and that Appellant was not going to "lose another brother." Records for a cell

phone associated with Appellant showed that six days after the shooting, he sent a text message that said, "[E]verythang gone by straight juss a matter of time . . . juss cant come back to atlanta its a good reason i did wat i did it was either him or my bra."

Investigators arrested Appellant in Fort Valley more than four months later. He did not testify at trial. His theories of defense were that Sagoes or White could have shot Bennett; that the two eyewitnesses' accounts of the shooting were not credible; and that the case was not adequately investigated.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's customary practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33

(673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).[2]

2. (a) In his January 2018 second amended motion for new trial, Appellant claimed for the first time that his constitutional right to due process was denied because he was legally incompetent at the time of his trial in June 2015 and that his trial counsel provided ineffective assistance by failing to investigate his incompetency. To support those same two claims on appeal, Appellant points to testimony he presented during the May 2019 hearing on the motion for new trial from his mother Barbara Banks, his trial counsel Robert Citronberg, and expert forensic psychologist Dr. Jamie Dickson.

Banks testified that as a child, Appellant was hyperactive and in special education classes, and that at about age nine, he was

[2] We remind litigants that the Court will end its practice of considering the sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83, 94) (2020). The Court began assigning cases to the December Term on August 3, 2020.

placed in the custody of the Division of Family and Children Services (DFCS) and then treated at the Devereux Advanced Behavioral Health facility until he was about 18 years old. Banks also testified that as an adult, Appellant "was on disability" and did not work because he was angry, hyperactive, and "couldn't function right," and that he had a seizure disorder that "affect[s] his mental functioning." She claimed that she told Citronberg that Appellant had "a mental case," but Citronberg never procured Appellant's records.

Citronberg, who is a very experienced criminal defense attorney, testified on direct examination that before Appellant's trial, he spoke to Banks, who indicated that Appellant had been in a special education class as a child; that he asked her to look for any records she had regarding Appellant's education; and that she could not find any. Citronberg added that he may have called some schools in search of the records, but that Banks never told him that Appellant had been in DFCS's care, so he did not contact DFCS.

Dr. Dickson testified that Appellant's records showed that

during his childhood, he had been diagnosed with Tourette's disorder, attention deficit hyperactivity disorder, and a mild intellectual disability and had been prescribed antipsychotic medication to treat paranoia, insomnia, and aggression; that he did not complete high school; and that his score on an IQ test administered when he was 15 years old was 55. Dr. Dickson interviewed Appellant for a total of six hours in November 2017 and January 2018. She administered an IQ test and concluded that Appellant's full scale IQ score was 47, "an extremely low range." Dr. Dickson also questioned Banks about Appellant's adaptive functioning and determined that his score was again in an "extremely low range." Dr. Dickson diagnosed Appellant with schizophrenia and a moderate intellectual disability.

Dr. Dickson administered a test for assessing legal competency in individuals with intellectual disabilities and concluded that Appellant's score was consistent with the mean score of individuals with intellectual disabilities who were found incompetent to stand trial. She noted in her report, which was admitted into evidence,

that Appellant's speech was not easily understood, and she testified that he reported auditory and visual hallucinations and that his responses to questions about his trial showed that he was not "able to communicate factual events about his case" and did not understand that he had been sentenced to life in prison. Dr. Dickson also noted in her report that Appellant did not know the meaning of several basic legal terms, including "guilty or not guilty," "sentence," and "testify," and did not understand the role of the jury, witnesses, prosecutor, or judge.

Dr. Dickson testified that she attempted to assess whether Appellant was malingering about his reported mental health symptoms, but she concluded that she could not obtain valid test results because the assessment questions needed to be asked verbatim and Appellant could not understand what she was asking. Dr. Dickson testified on cross-examination that she considered administering a test to determine cognitive malingering, but that none of those types of tests are validated for individuals with intellectual disabilities. In her report, Dr. Dickson said that

Appellant appeared to put forth his maximum effort on the IQ test and that "it is unlikely that [Appellant] was exaggerating the extent of any of his mental health conditions." Based on her evaluation, Dr. Dickson concluded that Appellant would not have been able to reasonably assist his attorney during trial; that he would not have been able to comprehend his own rights at trial; and that it was "highly unlikely that he would have been competent" at the time of his trial.

To rebut Dr. Dickson's conclusion, the State presented expert testimony from clinical psychologist Dr. Glenn Egan, who conducted a competency evaluation of Appellant in September 2018. Dr. Egan testified that based on the evaluation and several tests he administered to Appellant to assess malingering, he concluded that Appellant was "trying to look" intellectually and psychiatrically disabled.[3] Dr. Egan acknowledged that Appellant may have a mild

---

[3] Dr. Egan acknowledged on cross-examination that two of the tests for malingering that he administered had not been validated for intellectually impaired individuals, but he explained that Appellant's scores on those tests were not borderline, indicating that Appellant was exaggerating his impairments rather than misunderstanding the tests' questions.

intellectual disability but explained that an individual could easily "fake" a low IQ score. Dr. Egan also said that there is a "probable likelihood" that Banks exaggerated Appellant's impairments when she answered questions about his adaptive functioning. Dr. Egan concluded that based on all of the evidence, Appellant was competent at the time of his trial.

The State also offered a substantial amount of other evidence to rebut Appellant's claim that he was incompetent at the time of his trial. Trial counsel Citronberg testified on cross-examination that he and Appellant were able to communicate with each other about the case; that it appeared that Appellant understood those communications; that he had arranged for competency evaluations in other criminal cases; and that he would have filed a motion to determine Appellant's competency if Appellant had not understood their communications. Citronberg also testified that Appellant understood the charges against him and the consequences of going to trial; that Appellant was capable of assisting in his defense; and that at the time of trial, Citronberg did not believe that Appellant

was incompetent. In addition, two prosecutors on Appellant's case testified that there was no indication during trial that he was incompetent.

Appellant's jail and prison records showed that he was not prescribed any psychotropic medication while he was incarcerated before and during his trial. The State also introduced into evidence a report from a routine assessment by a mental health associate at the Fulton County Jail five days after Appellant's trial ended. The report said that Appellant had no noted psychosis and "appropriate thought content, tight associations, and a pleasant affect," and that Appellant said that his family was "keep[ing] on [his] lawyer to make sure he get[s] an appeal." In September 2018, Appellant told a prison counselor that he had been sentenced for a "murder that did not involve him" and that he was "working with his lawyer to get his overturn." In addition, the State introduced into evidence documents relating to Appellant's 1998, 2004, 2005, and 2007 guilty pleas to various crimes; the transcripts of the guilty plea hearings give no indication of incompetence, and during one of the hearings

Appellant asked the trial court if it could "reinstate me on my probation [for a probation violation in another case] . . . or try to get me another court date." The State also tendered an excerpt from Appellant's trial transcript in which he answered without difficulty a series of the court's questions about whether he wanted to testify.

Finally, the State tendered into evidence audio recordings and transcripts of dozens of phone calls Appellant made while he was incarcerated after trial. During several of the calls, Appellant mentioned going to court and asked his mother Banks to call his lawyer or to retrieve "paperwork" from the Social Security Administration and Devereux. During one call, he mentioned wanting to "get rid of [his] life sentence" or have it "reduce[d]"; during another, he advised Banks not to get upset on the stand "[b]ecause they [are] going to keep asking you the same question [in] different ways," adding that "my lawyer probably already told you about that though." Another call showed that when Banks began talking about the facts of Appellant's case, Appellant said, "[W]e ain't gonna talk about that on the phone." Dr. Egan testified that

Appellant's discussions during the phone calls were not consistent with an IQ score of 47 and that the calls showed that Appellant had the ability to recall events and "understood what he was facing."

In its order denying Appellant's amended motion for new trial, the trial court found that Appellant was legally competent at the time of his trial. The court noted in particular that although the evidence admitted at the hearing on the motion suggested that Appellant "may have learning and . . . behavioral difficulties, the jail phone calls presented by the State demonstrate [his] keen understanding of his legal situation and involvement in the handling of his case" and that nothing in Appellant's communications with the court throughout his case "gave rise to a concern about his competency." The trial court also ruled that Appellant's trial counsel did not provide ineffective assistance.

(b) Appellant claims first that the trial court erred by concluding that he was competent when he stood trial in June 2015. We disagree.

"[T]he constitutional guarantee of due process forbids the

conviction of [a defendant] who is incompetent." *Humphrey v. Walker*, 294 Ga. 855, 857 (757 SE2d 68) (2014). But "'[t]he threshold for competency is easily met in most cases,'" as the test for competency is merely whether at the time of trial the defendant is capable of understanding the nature and object of the proceedings, comprehends his own condition in reference to those proceedings, and is able to assist his counsel in providing a proper defense. *Sims v. State*, 279 Ga. 389, 390, 392 (614 SE2d 73) (2005) (citation omitted). When a finding of competency is challenged on appeal, the question is whether, "after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence that he was incompetent to stand trial." Id. at 391. See also *Traylor v. State*, 280 Ga. 400, 406-408 (627 SE2d 594) (2006) (holding that when a defendant raises for the first time in a motion for new trial a substantive due process claim based on his alleged incompetency at the time of his trial, he must prove by a preponderance of the evidence that he was in fact incompetent at that time).

Appellant argues that the trial court erred by finding that he had not met his burden of proving that he was incompetent at the time of his trial because Banks's and Dr. Dickson's testimony about Appellant's impairments was more credible than Dr. Egan's testimony that Appellant was malingering. But the credibility of the witnesses at the motion for new trial hearing was for the trial court to determine, and the court was entitled to credit Dr. Egan's opinion. See, e.g., *Tye v. State*, 298 Ga. 474, 477-478 (782 SE2d 10) (2016) ("[I]t was for the [trial] court, as fact finder, to judge the credibility of the opposing expert witnesses [regarding the appellant's competency].").[4]

Moreover, the trial court's conclusion was supported by substantial evidence other than Dr. Egan's testimony. Appellant's

---

[4] Citing *Sims*, in which we held that the evidence presented at Sims's competency proceeding showed that he was incompetent to stand trial, Appellant notes that his score of 47 on the IQ test that Dr. Dickson administered approximates Sims's IQ of 45-46. See 279 Ga. at 391. But "a low IQ score alone is just one indicia, not a determinative finding, that a defendant is unable to stand trial." Id. at 393. In any event, *Sims* is factually distinguishable from Appellant's case, because none of the expert witnesses who evaluated Sims opined that he had exaggerated his cognitive impairments. See id. at 392.

experienced trial counsel and two prosecutors on his case saw no indications before or during trial that Appellant was incompetent, nor was any issue of Appellant's competency raised in his four prior criminal cases. The trial court noted that its communications with Appellant raised no concern about his competence during the trial, and Appellant does not argue that the court should have conducted a sua sponte inquiry into his competency. See *Biggs v. State*, 281 Ga. 627, 629 (642 SE2d 74) (2007) (explaining that a defendant's right to procedural due process is violated when the trial court fails to sua sponte hold a competency hearing after information that raises a bona fide doubt about the defendant's competence becomes known to the court before or during trial).

In addition, Appellant did not appear incompetent during his post-trial interactions with jail and prison personnel, and his comments to them demonstrated his understanding that he had been sentenced for murder and that he was working with his lawyer to appeal his convictions. Perhaps most telling, as the order denying the motion for new trial points out, the recordings of the jail phone

calls showed that Appellant understood his legal situation and was actively assisting his post-conviction counsel in preparing for the motion for new trial proceedings. Viewed in the light most favorable to the State, the evidence presented at the motion for new trial hearing was easily sufficient to authorize a rational trier of fact to conclude that Appellant failed to prove by a preponderance of the evidence that he was incompetent to stand trial. See, e.g., *Tye*, 298 Ga. at 480; *Slaughter v. State*, 292 Ga. 573, 579 (740 SE2d 119) (2013). Accordingly, this claim fails.

(c) Appellant's other claim is that his trial counsel Citronberg provided ineffective assistance by failing to investigate his incompetency. To prove this claim, Appellant must show both that his counsel's performance was professionally deficient and that, but for the deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. See *Strickland v. Washington*, 466 U.S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984). See also *Wiggins v. Smith*, 539 U.S. 510, 521-522 (123 SCt 2527, 156 LE2d 471) (2003). We need not address both

parts of this test if Appellant makes an insufficient showing on one. See *Strickland*, 466 U.S. at 697.

Pretermitting whether Citronberg performed deficiently by failing to explore the issue of Appellant's incompetency, Appellant has not met his burden of showing a reasonable probability that an investigation would have resulted in his being found incompetent to stand trial. We presume that had Citronberg investigated Appellant's incompetency and presented evidence in support of his claim at a pretrial competency hearing, it would have been the same evidence that Appellant's new counsel presented at the motion for new trial hearing. See *Scott v. State*, 301 Ga. 573, 579 (802 SE2d 211) (2017) ("[A] claim of prejudice from deficient performance fails as speculative unless the defendant produces or proffers the evidence that competent performance allegedly would have produced."). See also *Martin v. Barrett*, 279 Ga. 593, 595-596 (619 SE2d 656) (2005). As we explained above, the evidence presented at the hearing was sufficient to support a rational finding that Appellant was competent to stand trial. Appellant has therefore

failed to show that but for Citronberg's failure to investigate, there is a reasonable probability that he would have been found incompetent at the time of his trial. See *Scott*, 301 Ga. at 579-580.

*Judgment affirmed. All the Justices concur, except Warren, J., not participating.*

Decided September 28, 2020.

Murder. Fulton Superior Court. Before Judge Krause.
*Stephen R. Scarborough*, for appellant.
*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Stephany J. Luttrell, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.