NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 5, 2026

S25A1220.  ADAMS v. THE STATE.

LAND, Justice.

Tony Adams, Jr. was convicted of malice murder and other crimes in relation to the stabbing and shooting death of his mother, Belinda Woodson.[1] On appeal, Adams argues that his trial counsel

---

[1] The crimes occurred on May 10, 2018. On July 16, 2018, a Dooly County grand jury indicted Adams, charging him with malice murder (Count 1), felony murder (Count 2), two counts of aggravated assault (Counts 3-4), possession of a firearm during the commission of a felony (Count 5), and possession of a knife during the commission of a felony (Count 6).

At a trial from October 25 through 28, 2021, a jury found Adams guilty on all counts. On November 2, 2021, the trial court sentenced Adams to serve life in prison without the possibility of parole for Count 1, a 20-year sentence for Count 4 (consecutive to Count 1), a five-year sentence for Count 5 (consecutive to Count 1), and a five-year sentence for Count 6 (consecutive to Count 4). Count 2 was vacated by operation of law. Although the trial court purported to merge Count 3 into Count 2 for sentencing purposes, it should have instead been merged into Count 1 because Count 2 was vacated. However, we decline to correct the error because a correction would have no impact on Adams's sentence. See *Williams v. State*, 316 Ga. 147, 153 (2023) (where "the trial court's incorrect nomenclature did not affect [a]ppellant's sentence," "there is no sentencing error to correct").

Adams filed a timely motion for new trial on November 1, 2021, which

rendered constitutionally ineffective assistance by failing to properly investigate Adams's competency to stand trial, failing to raise an insanity defense, and stating during Adams's direct examination in front of the jury "Are you for real here today? Are you expecting us to believe all this nonsense?" Adams also argues that the trial court erred by denying his motion to conduct a post-judgment competency hearing. For the reasons that follow, we affirm in part, vacate in part, and remand the case for resentencing.

The evidence presented at trial showed that Adams lived with Woodson and her husband, Tyrone Woodson ("Tyrone"). Tyrone testified that, on the morning of May 10, 2018, while he was at work, he got a call from Woodson about Adams "acting up." He advised Woodson to call the police and ask that Adams "be removed from the house." Woodson told Tyrone that she spoke with the police but they

---

was later amended through new counsel on July 30, 2024. Following a hearing on January 14, 2025, the trial court denied the motion for new trial, as amended, on April 14, 2025. Adams timely filed a notice of appeal on April 21, 2025. This case was docketed to the August 2025 term of this Court and submitted for a decision on the briefs.

"said nothing could be d[one] about it that day."[2] Tyrone came home at lunch, thought "everything was all right" between Woodson and Adams, and then returned to work.

Tyrone further testified that, when he arrived home around 7:30 p.m., things at the house were "like normal." But then Adams broke a window in his room, and Woodson became upset and called the police. Around 10:20 p.m., two officers came to the house, but Adams was not removed.[3]

After the officers left, Tyrone went into the primary bedroom, and Woodson brought him a sandwich. Woodson went back towards the kitchen, and then there was a "commotion." Tyrone testified that Woodson ran back into the bedroom, tripped, and fell on the bedroom

---

[2] An officer testified that Woodson came into the Vienna police station around 10:30 a.m. that morning "to make a complaint" about Adams and said that she "wanted [Adams] to leave." The officer went to the house and spoke with Adams, who seemed "calm." He advised Woodson that, since Adams had been living at the house, his removal was "a matter that [Woodson] had to go talk to the Magistrate Court Judge on." He testified that no threats had been made and that, when he left the house, neither Woodson nor Adams seemed upset.

[3] These officers testified that they spoke to Woodson and Adams and concluded that they could not "force [Adams] to leave" because there was "no intent to commit a crime when he broke the window." When the officers left, "[t]here was no sign of aggression" and nobody was "threatening anybody."

floor. Adams, who was "running behind" Woodson, got "on her back, like trying to stab her." Adams stabbed Woodson twice before Tyrone was able to take the knife from him. Tyrone "thought for sure that [Woodson] had r[u]n out the door," because he no longer saw her and she was not answering him.[4] Adams ran towards his room and then back towards Tyrone, so Tyrone ran out the front door. As he did, Tyrone heard "two or three" gunshots.[5]

Across the street at a neighbor's house, Irving Young, Evokeyo Lundy, and Joseph Smith were outside in the yard. Lundy testified that he heard a woman "scream out," the men heard gunshots, and Tyrone came running out of his house towards them. Tyrone told the men to call the police because Adams had either "killed himself or he killed his mother." Adams then ran out of the house after Tyrone, holding a gun and calling out, "pop, I got this. I got this." Tyrone "took off running again" towards another neighbor's house. Tyrone told the second neighbor that he had taken a knife from Adams

---

[4] Woodson instead had gone into the bathroom; the water was still running when investigators arrived at the scene.

[5] Tyrone testified that, to his knowledge, there were no guns in the house.

because Adams was "sticking his mama." Tyrone placed the knife in a bag, gave it to the neighbor, and told him to call the police. Meanwhile, Smith attempted to talk to Adams and tried to calm him down. Lundy testified that Adams then "aim[ed] the gun … and sho[t] himself" in the arm before returning to his house.

At 11:02 p.m., the two officers who responded to the earlier call about the broken window responded to a report of "shots fired" at Woodson's house. Adams ran up to the patrol cars to speak with the officers, who noticed that Adams had "a piece of clothing wrapped around his left arm." Adams told them that Woodson "had tried to stab him, and he took the knife from her. … when he took the knife, she shot him in the arm, and he took the gun away from her." Adams then told one of the officers that "when he took the gun, he done what needed to be done, and she was dead." The other officer handcuffed Adams and placed him in the back of his patrol vehicle. He then went inside the house to check on Woodson and found her lying face down on the floor between the bedroom and bathroom with a gun by her left hand. Woodson was pronounced dead at the scene,

and a medical examiner testified at trial that Woodson's cause of death was multiple gunshot and sharp force wounds.

An investigator who responded to the scene testified that the blood stain around Woodson's body indicated that she was standing in the door between the bathroom and bedroom when she was killed. He recovered a Jiminez Arms 9mm firearm from Woodson's hand and noted that the direction in which the firearm was laying did not "look right" and made "no sense for someone who held a gun in that hand." The investigator located several cartridge casings and bullets inside the bedroom and hallway, as well as a cartridge casing and some blood stains on a table in Young's yard.[6] In Adams's bedroom, the investigator found a gun box containing a box of 9mm ammunition, which matched the make and caliber involved in the shooting, as well as a safe box containing a "bunch of knives."[7] He

---

[6] A firearms examiner testified that the seven 9mm cartridge casings recovered from the scene – including the one from Young's yard – and the four bullets – including the one removed from Woodson's body – were all fired from the Jiminez Arms 9mm pistol.

[7] Fingerprints were lifted from the box of ammunition, and the crime lab confirmed that two of the fingerprints were Adams's.

also noted a "blood drip trail" that had been left by someone who had traveled from Young's yard into Woodson's bedroom.

Adams was taken to the Dooly County Jail, where he was advised of his rights pursuant to *Miranda v. Arizona*, 384 US 436 (1966), and subsequently interviewed by law enforcement. The investigator who interviewed Adams testified that Adams could read and write, did not appear to be under the influence of any drugs or alcohol, and was responsive to the questions asked during the interview. Adams initially claimed that Woodson came from the kitchen with a knife, that he took it and "stabbed her ... a few times" before she ran back towards the bathroom and shot him in the arm as he was standing in the hallway. Adams then "got the gun" from Woodson and shot her several times. He claimed that he never shot the gun outside.

Later, when confronted with the ballistics evidence, Adams eventually conceded that Woodson did not shoot him. He then admitted that he shot himself in the arm outside in the neighbor's yard, returned to his house, and then placed the gun in Woodson's

7

hand because he needed "some type of … defense in [his] way."

Adams testified in his own defense at trial, where he again admitted to stabbing and shooting Woodson. Following these admissions, his trial counsel inquired into Adams's motive. Adams testified that there was a "situation between me, my mother, and the money that was with my mother" and that he "was setup. … my mother activated the anger in me." He claimed that he was not "there in the spirit" when he killed Woodson, that his "body had a criminal in it" and committed the crimes, and that he could not remember the situation. Adams attributed his actions to the fact that he had previously been "hit with needles and blood" and was "drug-abused and date raped." When asked why he shot himself in the arm, Adams stated it was because of a "clear possession. Possession. An exorcism." Adams's counsel then asked, "Really. Seriously. Are you for real here today? Are you expecting us to believe all this nonsense?" to which Adams replied, "A hundred percent."

1. Adams argues that his trial counsel was ineffective because

he failed to properly investigate Adams's competency to stand trial, failed to raise an insanity defense, and stated during Adams's direct examination in front of the jury, "Are you for real here today? Are you expecting us to believe all this nonsense?" We are unpersuaded.

For Adams to prevail on his ineffective assistance claims, he must show that his trial counsel performed deficiently and that the deficiency prejudiced him. See *Strickland v. Washington*, 466 US 668, 687 (1984). To show deficiency, Adams must establish that his trial counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Taylor v. State*, 315 Ga. 630, 647 (2023) (citation and punctuation omitted). The law "recognizes a 'strong presumption' that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption." *Evans v. State*, 315 Ga. 607, 611 (2023) (citation and punctuation omitted). And "hindsight has no place in an assessment of the performance of trial counsel, and a lawyer second-guessing his own performance with the benefit of hindsight has no significance for an ineffective assistance

of counsel claim." *Taylor*, 315 Ga. at 649 (citation and punctuation omitted).

To satisfy the prejudice prong, Adams "must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different." *Scott v. State*, 322 Ga. 395, 400 (2025) (citation and punctuation omitted). If Adams "fails to make a sufficient showing on either the deficiency or the prejudice prong, we need not address the other prong." Id. "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." *Payne v. State*, 314 Ga. 322, 329 (2022) (citation and punctuation omitted).

(a) Adams argues that his trial counsel rendered ineffective assistance by failing to properly investigate his competency to stand trial. We disagree.

On June 21, 2018, the trial court ordered a mental health evaluation to determine Adams's competency to stand trial. Adams was evaluated by the Georgia Department of Behavioral Health on

10

March 21, 2019 and was found competent. The report noted that Adams "reported a recent history of mental health symptoms" but that the symptoms resulted from his "significant illicit drug use," and that Adams's test results indicated that he was "grossly feigning his psychiatric symptoms." The report also stated that, although Adams "might be experiencing some depression or anxiety related to his current legal situation, his symptoms do not appear to be adversely affecting his understanding of his legal situation" and concluded that Adams had "the capacity to understand the nature and object of the proceedings against him, comprehend his own condition in reference to the proceedings, and … assist his attorney in providing a proper defense."

"The threshold for competency is easily met in most cases." *Gray v. State*, 309 Ga. 850, 855 (2020) (cleaned up). We ask whether, at the time of trial, the defendant was "capable of understanding the nature and object of the proceedings, comprehends his own condition in reference to those proceedings, and is able to assist his counsel in providing a proper defense." Id. Generally speaking, "a trial

11

counsel's decision to for[]go or curtail further investigation of an accused's mental health, even when there has been a previous mental hospitalization, is reasonable when an expert has determined that the defendant is fit to stand trial." *Sullivan v. State*, 308 Ga. 508, 513 (2020) (cleaned up).

Here, Adams has failed to establish that it was objectively unreasonable for trial counsel not to further investigate his competency to stand trial. Prior to trial, Adams underwent a mental health evaluation, and the findings not only deemed him competent to stand trial but also concluded that he was "feigning" his psychiatric symptoms. Although the evaluation was performed two years before the trial, counsel testified that he "never saw or heard or observed anything in [his] interaction with [Adams] that would have … given [him] any reason to suspect [Adams's] competency" to stand trial, and Adams does not point to any evidence arising subsequent to the report which would indicate that his mental

health had changed since it was issued.[8] Under these circumstances, trial counsel did not perform deficiently in forgoing a second competency opinion. See *Sullivan*, 308 Ga. at 514 ("Given this record, even if other attorneys might have explored the mental issue further, we cannot conclude that the investigation by and tactical judgment of [a]ppellant's attorney was outside the wide range of reasonably effective assistance." (citation and punctuation omitted)).

(b) Adams argues that trial counsel also rendered ineffective assistance by not raising an insanity defense. We disagree.

"An attorney's decision about which defense to present is a question of trial strategy, and trial strategy, if reasonable, does not constitute ineffective assistance of counsel." *Brooks v. State*, 309 Ga. 630, 637 (2020) (citation and punctuation omitted). See *Taylor*, 315

---

[8] Although Adams points to the testimony of a nurse at the Dooly County Jail where Adams was incarcerated prior to trial that she referred Adams to Middle Flint Behavioral Services for a mental health evaluation where he was prescribed medication, the nurse also testified that Adams never made any comments that she perceived as "delusion[al]," that she sent him to behavioral services because he "wanted to change his name," and that his behavior was consistent with "just being a difficult person."

Ga. at 647–49 (holding that trial counsel's decision not to raise an insanity defense was not an objectively unreasonable trial strategy where counsel considered a psychological report that defendant was not suffering from a delusion at the time of the crimes, ceased additional investigation into defendant's mental health, and decided against raising additional evidence that could have supported an insanity defense).

At the hearing on Adams's motion for new trial, trial counsel testified that his defense theory at trial was one of self-defense. There was some evidence presented at trial to support this theory, including that Woodson was upset with Adams, Adams's testimony that Woodson stabbed and shot him, and that her body was found with a gun.[9]

Meanwhile, there was nothing in Adams's mental health evaluation or in trial counsel's interactions with Adams that led

---

[9] As noted above, however, Adams admitted to investigators during his interview that he stabbed and shot Woodson, shot himself in the arm, and then placed the gun back in her hand. The physical evidence at the scene and several eyewitnesses corroborated this version of events.

14

counsel to believe that Adams suffered from insanity. In fact, his mental health evaluation concluded that his mental status at the time of Woodson's murder was the result of intoxication, that Adams "was able to distinguish right from wrong," and that he "was not operating under a delusional compulsion that overmastered his will to commit the alleged offense." Accordingly, trial counsel's decision to pursue a defense theory of self-defense instead of an insanity defense was objectively reasonable, see *Starks v. State*, 283 Ga. 164, 168 (2008) (trial counsel's decision to pursue a self-defense strategy instead of an insanity defense was reasonable where psychiatrist who examined defendant concluded that he was not legally insane), and Adams's claim of ineffective assistance therefore fails.

(c) Adams argues that his trial counsel rendered ineffective assistance when he asked him, in front of the jury during direct examination, "Are you for real here today? Are you expecting us to believe all this nonsense?" We disagree.

During trial counsel's direct examination of Adams, Adams was asked about his motive for killing Woodson. He testified that

his mother "activated the anger in [him]," that he was not "there in spirit" when he killed her, that he had previously been "drug-abused and date raped," and that he shot himself in the arm because of a "possession" and "exorcism." This led to trial counsel's questions indicating that Adams's testimony was "nonsense."

During the hearing on Adams's motion for new trial, trial counsel testified that he originally prepared to present a self-defense theory at trial but agreed that he "may have had to change trial strategies" once Adams testified that he shot and stabbed his mother.

Even assuming that trial counsel's comments amounted to deficient performance, Adams has failed to show that he was prejudiced. He merely argues that the questions "cast doubt on [his] testimony and credibility" and were "disparaging to" his case. Even if we accept that argument, the jury was authorized to discredit Adams's testimony without these questions, and there was significant evidence that Adams killed Woodson without any valid excuse or justification presented at trial. Thus, it is not reasonably

16

likely that counsel's questions affected the outcome of Adams's trial. See *Taylor*, 315 Ga at 650–51 (assuming without deciding that trial counsel's performance was deficient, "[w]e cannot say that there is a 'reasonable probability' that [defendant] would have received a lighter sentence" where evidence of defendant's guilt, which included his own admissions, was strong).

2. Adams also argues that the trial court erred by denying his motion to conduct a post-judgment competency hearing to determine whether he had been competent to stand trial. Because we conclude that the trial court did not abuse its discretion, we reject this argument.

Adams's trial concluded on October 28, 2021. On July 30, 2024, as part of his amended motion for new trial, Adams moved the court to conduct a post-judgment competency hearing. In its order denying Adams's motion for new trial, the trial court denied Adams's request for the hearing. Specifically, the trial court held:

> The record before this court contains an evaluation of [Adams] two and a half years before trial that he was competent to stand trial and criminally responsible. His

17

attorney found no reason to believe he was incompetent when working with him prior to and during the trial. At present, [Adams] is some three years and five months post-trial, and the court does not believe such an inquiry at this late date would be informative.

In *Cane v. State*, 285 Ga. 19, 21–22 (2009), we considered whether the trial court abused its discretion by denying appellant's post-trial motion that a psychiatric examination was necessary because "his incompetency was indicated by the 'emotional and obsessive behavior' he demonstrated at trial and at the hearing on his motion for new trial regarding his 'unreasonable' belief that his statements to the police had been edited." But the appellant "did not, either prior to or during trial, raise the issue of incompetency or seek a hearing regarding his competency, and our examination of the record fail[ed] to reflect anything that would have required the trial court to make a sua sponte inquiry about it." Id. at 22. We concluded that the trial court did not abuse its discretion by denying appellant's motion. Id.

While Adams did raise an issue concerning his competency prior to trial, the mental health evaluation declaring him competent

18

to stand trial was presented to and reviewed by the trial court. Throughout the investigation and during the trial, Adams agreed that he understood the proceedings against him. And Adams's counsel testified that he found no reason to believe that Adams was incompetent prior to or during the trial. Even if Adams's self-serving testimony could have been interpreted to support his claim of incompetence, it was within the trial court's discretion to assess Adams's demeanor and other conduct at trial to determine whether there was a question about his competency. And here, the trial court had been presented with a mental health evaluation that opined that Adams was largely feigning his psychiatric symptoms. Moreover, Adams has not provided expert opinions or medical records to counter the pre-trial competency determination.[10] Thus, we see no abuse of discretion in the trial court's denial of Adams's motion for a post-judgment competency hearing.

3. Finally, although Adams does not raise the issue on appeal,

---

[10] As discussed above, the testimony of the nurse from the Dooly County Jail did not support Adams's argument that he was mentally incompetent.

the trial court erred when it convicted him of both malice murder (Count 1) and aggravated assault premised on a stabbing (Count 4), instead of merging the latter into the former. "Even when no party raises a merger error, if we note such an error, we have the discretion to correct it on direct appeal." *Dixon v. State*, 302 Ga. 691, 696 (2017). We exercise that discretion here.

> OCGA § 16-1-7(a) affords a defendant with substantive double jeopardy protection by prohibiting multiple convictions and punishments for the same offense. OCGA § 16-1-7(a)(1) prohibits a defendant from being convicted of more than one crime if one crime is included in another, and aggravated assault is included in the crime of malice murder when the former is established by proof of the same or less than all the facts.

*Johnson v. State*, 300 Ga. 665, 666 (2017) (cleaned up).

Adams was convicted of malice murder for the shooting death of Woodson and of aggravated assault for stabbing her with a knife. The medical examiner testified that Woodson's cause of death was multiple gunshot wounds *and* sharp force wounds. Although there was an interval between the stabbing and the shooting, this was not a case where the stabbing was a non-fatal injury. Based on the

20

evidence presented at trial, the record shows that the stabbing contributed to the death. Because the aggravated assault conviction was established by the same facts as the malice murder conviction, except that the malice murder conviction also required proof of malice aforethought, the aggravated assault conviction was included in the malice murder conviction and merged into it. See *Douglas v. State*, 321 Ga. 739, 750 (2025). As such, we hereby vacate Adams's conviction and sentence for Count 4.

Also, the trial court sentenced Adams to serve five years for the possession of a knife during the commission of a felony (Count 6), to run consecutively to the aggravated assault sentence (Count 4). Because we are vacating the aggravated assault conviction, the sentence on Count 6 cannot run consecutively to the sentence for Count 4. As such, we hereby vacate the sentence pertaining to Count 6 and remand for the trial court to resentence Adams on that count, which could run consecutively to another of the remaining counts. See *Ellington v. State*, 314 Ga. 335, 346 (2022) (remanding for resentencing because the sentence for a vacated conviction would

have run consecutively with two other sentences).

*Judgment affirmed in part and vacated in part, and case remanded for resentencing. All the Justices concur.*